551 A.2d 501

Charles G. MacGILL

v.

BLUE CROSS OF MARYLAND, INC.

No. 481, Sept. Term, 1988.

Court of Special Appeals of Maryland.

Jan. 6, 1989.

Charles Lee Nutt (Clements & Nutt, on the brief), Baltimore, for appellant.

Jack F. McGarvey (Mark L. Santangelo, on the brief), Baltimore, for appellee.

Argued before BISHOP, ALPERT and ROBERT M. BELL, JJ.

ROBERT M. BELL, Judge.

Charles G. MacGill, appellant, appeals from judgments of the Circuit Court for Baltimore County, granting motions for summary judgment and to dismiss in favor of Blue Cross of Maryland, Inc., appellee. He raises, for our resolution, two questions:

1. Was there a series of valid employee contract[s] or implied contract[s] based on Appellee's job postings and personnel policies with respect to the three subject positions to which Appellant was not selected?

2. Did the Appellant properly allege the tort of deceit?

We will hold that the trial court properly granted both the motion for summary judgment and the motion to dismiss for failure to state a claim upon which relief could be granted and, thus, will affirm.

1.

Appellant filed against appellee a complaint, which consisted of three counts, sounding in breach of his employment contract. At the heart of each count was appellant's contention that certain personnel guidelines, promulgated and issued by appellee, were contractual undertakings on

its part, which appellant accepted, and which thus became a part of his employment contract. He alleged that appellee failed to comply with those personnel guidelines in filling three job positions which became available, and for which appellant applied, during the later years of his employment with appellee.

The personnel policies which appellant maintains became a part of his employment contract, are:

1. Memo No. 200.60, requiring "each and every member of management to administer these [personnel] policies in a consistent and impartial manner."

2. Memo No. 200.45(C3), requiring certain vacant positions to be posted corporate wide; the personnel representative to screen applicants for minimum job qualifications; and the personnel representative to make a job offer to selected applicant and "promptly notify the remaining applicants of their status," "[i]f the decision is properly supported."

3. Memo No. 200,32(C2)[1] endorsing and committing itself "to equal opportunity regardless of race, religion, color, age, sex, political affiliation, mental or physical handicap or national origin in employment..."; "to take affirmative action to employ, advance in employment and otherwise treat qualified ... veterans of the Vietnam era without discrimination based upon their ... veteran status in all employment practices..."; and "to be consistent in our practices of treating all employees and/or applicants, whether or not members of minority groups, equally according to their individual merit, qualifications, ability, experience, and other bona fide occupational standards."

---

1. Memo No. 200 M.1(C3) is almost identical to Memo No. 200.32(C2); its subject, however, is "equal employment guidelines relating to Medicare business." It does purport to provide "additional policies and guidelines which must be adhered to by those employees who work in areas performing Medicare business" and to be "a supplement to the current 200 series." Consequently, the violations of this Memo need not be separately considered.

With particular regard to the filling of each of the vacant positions, appellant contends that appellee violated these policies in one or more of the following ways: by discriminating against him on the basis of age or sex; by not taking affirmative action in his favor pursuant to the Vietnam Era Veterans Readjustment Act; by not posting the vacant positions [2]; by not screening the applicants for minimum job qualifications; by failing to treat him equally with the successful candidate according to his individual merit, qualifications, ability, experience, and other bona fide occupational standards; and by hiring candidates when the decision to do so was not properly supported. It is evident both from the overall tone and context of the complaint and the arguments advanced in opposition to the motion for summary judgment that the evidence of the company's violation of its personnel policies is supplied by appellant's perception that he was the most qualified candidate for each vacancy and by the fact that he was not selected to fill any of them.

After a hearing, the trial court granted appellee's motion for summary judgment, ruling that the personnel policies at issue were general statements of policy and not contractual undertakings by appellee.

On appeal, as he did below, appellant relies upon *Dahl v. Brunswick Corp.*, 277 Md. 471, 356 A.2d 221 (1976) and *Staggs v. Blue Cross of Maryland*, 61 Md.App. 381, 486 A.2d 798 *cert. denied*, 303 Md. 295, 493 A.2d 349 (1985) to support his argument that appellee's personnel policies constituted an implied contract of employment between himself and appellee. Each of these cases does stand for the proposition that "employer policy directives regarding aspects of the employment relation become contractual obli-

---

**2.** The record clearly indicates that the position which is the subject of count 1, the job as Director of Underwriting Systems and Operations, was posted pursuant to the company's policies; hence, this violation does not apply to that count. There is a dispute between the parties as to whether the positions which are the subjects of counts 2 and 3 were subject to the posting requirements. In any event, it is clear that appellant was aware of and applied for each of them.

gations when, with knowledge of their existence, employees start or continue to work for the employer." *Dahl,* 277 Md. at 476, 356 A.2d 221, and cases therein cited. *See also Staggs,* 61 Md.App. at 392, 486 A.2d 798. In both cases, the employees, like appellant, were not subject to a written employment contract or a collective bargaining agreement. On the other hand, the incident of the employment to which the policy directives refer are different: *Dahl* and *Staggs* involved the termination stage of the employment, respectively, post-termination benefits and pre-termination procedures, while the case *sub judice* involves promotion procedures. The question thus presented is: do those cases mandate the conclusion urged by appellant in this case? We seek the answer by analyzing the policies found by the *Dahl* and *Staggs* Courts to constitute contractural undertakings.

The contractual obligation in *Dahl* was supplied by Brunswick's written policy statements and unwritten general practice of providing its employees with two weeks severance pay upon their termination. 277 Md. at 474, 356 A.2d 221. Brunswick not only conceded the existence of these written policy statements and its unwritten general practice, but it also agreed that they constituted an offer of a unilateral contract of which the employees were aware and, by continuing their employment, accepted. 277 Md. at 474–75, 356 A.2d 221. In *Staggs,* the relevant policy memorandum provided:

IV. Employees terminating due to dismissal are subject to the following conditions:

A. Except in extreme cases when dismissal will be immediate, employees will be given at least two formal counseling sessions by their supervisors and/or manager before final dismissal. All formal counseling sessions must be first reviewed with the Employment and Employees' Relations Department prior to any discussion with the employee. Formal counseling sessions with employees must be substantiated in writing by filing form 5.65 Problem Solving Report with the Em-

ployment and Employee Relations Department. During the second counseling session, the employee will be advised that continuance of the problem may result in dismissal. Failure to sign form 5.65, Problem Solving Report after it has been discussed, may provide grounds for immediate dismissal.

 * * * * * *

E. An employee may be dismissed at any time for cause without liability to Blue Cross and Blue Shield of Maryland.

We held that these provisions, which, by setting out termination procedures, had the effect of limiting the employer's discretion to terminate an indefinite employment, if properly expressed and communicated, are contractual undertakings by the employer and are enforceable by the employee, 61 Md.App. at 392, 486 A.2d 798 and, partially on that basis, reversed the lower court's ruling to the contrary. We were quick to point out, however, "that not every statement made in a personnel handbook or other publication will rise to the level of an enforceable covenant", noting, as had the Minnesota Supreme Court in *Pine River State Bank v. Mettille*, 333 N.W.2d 622, 626 (Minn.1983), that "general statements of policy are no more than that and do not meet the contractual requirements for an offer." *Id.*

Although stated in general terms, denoting applicability to all employees, the policy directives in *Dahl* and *Staggs*, were also capable of objective application in discrete cases. Stated another way, whether an employee was entitled to receive severance pay or whether an employee was terminated in violation of the company's announced termination procedures could be determined by reference only to the circumstances applicable to the affected employee and without regard to that of other employees; there was no necessity of evaluating the relative merit of the employer's decision vis-a-vis the affected employee's claim by reference to similar claims made by some other employee. In short, notwithstanding the generality of their expression, the policies were, in the final analysis, employee specific. More-

over, implicit in the personnel policies was a promise, made to each employee, of a definite and specific benefit should the company's proposed contractual undertaking be accepted. In *Dahl*, the promised benefit was two weeks severance pay; in *Staggs*, it was the applicability of, and access to, otherwise unavailable pre-termination procedures.

The policy directives in the case *sub judice*, when measured against the *Dahl* and *Staggs* standard, do not have the requisite characteristics of a contractual undertaking. The major deficiency is that they do not promise appellant, or any of appellee's other employees, any specific and definite benefit. At best, by promulgating and circulating these policies, appellee promised its employees only the opportunity to apply for vacant positions for which they qualify and its commitment to fill those vacancies with the most qualified applicant, consistent with the law, fairness, and its expressed intention to take affirmative action in appropriate cases. No where in the policies is there an express commitment, indeed, they do not give rise to even an inference of a commitment, to promote appellant if he is qualified for a position. More to the point, however, they do not permit the decision as to who is the most qualified applicant for the vacancy to be made by anyone other than appellee.

Appellant does not contend that the policy directives were a promise to him of a promotion; rather, he alleges that, as between the successful applicant in each case and himself, he was the most qualified and that notwithstanding that fact, he was not hired. Thus, the critical element of appellant's action against appellee is his allegation, based upon his perception, that he was the most qualified applicant for each of the vacant positions and yet was not hired to fill them. In point of fact, it is solely upon that allegation that appellant relies as proof that appellee violated its personnel directives. Such an allegation does not suffice to generate a genuine dispute of material fact for resolution by a trier

of fact.[3]

The long and short of this case is that the personnel policies relied upon by appellant as establishing contractual undertakings, on the part of appellee, that are enforceable by appellant, under the circumstances *sub judice*, simply are not sufficient. They are no more than "general statements of policy", which do not, and indeed could not, "meet the contractual requirements for an offer." Personnel policies that specifically prescribe and limit the procedures that an employer must use in filling vacant positions, but do not prescribe with whom they are to be filled, do not rise to the level of contractural undertakings. And they are not elevated to that status by allegations that one of the applicants is more qualified than the other applicants.

Having reviewed the pleadings, depositions, answers to interrogatories, admissions and affidavits, Maryland Rule 2–501(e), and found no genuine dispute of material fact and, further, having viewed the facts in the light most favorable to appellant, resolving all inferences against appellee, as we must, *Austin v. Thrifty Diversified,* 76 Md.App. 150, 152–3, 543 A.2d 889 (1988); *May Dep't Stores v. Harryman,* 65 Md.App. 534, 538, 501 A.2d 468 (1985), *aff'd,* 307 Md. 692, 517 A.2d 71 (1986), we hold that, under the circumstances here presented, the trial court correctly granted summary judgment.

2.

 Appellant also challenges the propriety of the dismissal, without leave to amend, of count 4 of his complaint for failure to state a claim upon which relief can be granted. That count sought to allege the tort of deceit. To prevail in such an action, the plaintiff must show:

---

**3.** Were such allegations accepted as sufficient, the courts would necessarily become involved in the assessment of the propriety and soundness of a company's personnel decisions; the courts would be required to act as super personnel officers, overseeing and second-guessing the company's decisions whenever an unsuccessful applicant perceives him—or herself to have been the most qualified applicant.

(1) that a representation made by the respondent was false;

(2) that its falsity was known to him;

(3) that the misrepresentation was made for the purpose of defrauding the plaintiff;

(4) that the plaintiff not only relied upon the misrepresentation, but had the right to do so and would not have done the thing from which the damage resulted if it had not been made; and

(5) that the plaintiff suffered damage (meaning an injury subject to being redressed by compensatory damage) directly resulting from the respondent's misrepresentation.

*James v. Weisheit,* 279 Md. 41, 44, 367 A.2d 482 (1977), citing *Wedeman v. City Chevrolet Co.,* 278 Md. 524, 532 n. 5, 366 A.2d 7 (1976).

The appropriate test to be applied when reviewing the propriety of the grant or denial of a motion to dismiss is whether, when all well-pleaded material facts in the complaint and any exhibits thereto, as well as any reasonable inferences that may be drawn therefrom are taken as true, a set of facts is alleged, which, if proven, would entitle the plaintiff to relief. *Flaherty v. Weinberg,* 303 Md. 116, 135–36, 492 A.2d 618 (1985); *Berman v. Karvounis,* 308 Md. 259, 264–65, 518 A.2d 726 (1987); *Ungar v. State,* 63 Md.App. 472, 479, 492 A.2d 1336 (1985), *cert. denied,* 475 U.S. 1066, 106 S.Ct. 1379, 89 L.Ed.2d 604 (1986). "But what we consider are allegations of fact and inferences deduced from them, not merely conclusory charges." *Berman,* 308 Md. at 265, 518 A.2d 726, citing *Lord Calvert Theatre v. Baltimore,* 208 Md. 606, 614, 119 A.2d 415 (1956); *Sims v. Ryland Group, Inc.,* 37 Md.App. 470, 472, 378 A.2d 1 (1977).

Even if we assume that appellant well-pleaded facts to support the first four elements of the tort, we do not believe that his allegations of fact are sufficient as to the last. It may be recalled that appellant at no time alleged

that he was promised the position should he apply for it; rather, he attempts to bridge the gap between the mere right to apply and his entitlement to damages by adopting the same argument we rejected in connection with the contract counts. That argument is no more effective in this context. Appellant's allegation that he suffered damage as a result of appellee's false representations was, under the circumstances, nothing more than a "conclusory charge." That being so, count 4 could not withstand a motion to dismiss and the lower court correctly granted the motion.

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANT.