569 A.2d 1299

**Peter J. FOURNIER**

v.

**UNITED STATES FIDELITY & GUARANTY COMPANY.**

**No. 728, Sept. Term, 1989.**

Court of Special Appeals of Maryland.

Feb. 28, 1990.

Certiorari Denied May 30, 1990.

Charles Lee Nutt (Clements & Nutt, on the brief), Baltimore, for appellant.

Stephen D. Shawe (Mark J. Swerdlin and Shawe & Rosenthal, on the brief), Baltimore, for appellee.

Argued before BISHOP, KARWACKI, RICHARD M. POLLITT (Retired, Specially Assigned), JJ.

KARWACKI, Judge.

On June 24, 1987, Peter J. Fournier, the appellant, filed an action in the Circuit Court for Baltimore City against United States Fidelity and Guaranty Company, the appellee, alleging that his employment by appellee had been wrongfully terminated. He sought compensatory and punitive damages. After the parties had conducted discovery, appellee moved for summary judgment. Following a hearing on

that motion and appellant's opposition thereto, the court entered summary judgment in favor of the appellee. In his appeal from that judgment appellant questions the propriety of the court's disposition of his claim by summary judgment.

### FACTS

The record before the hearing judge, when viewed most favorably to the appellant, Rule 2–501(a); *Berkey v. Delia,* 287 Md. 302, 304–05, 413 A.2d 170 (1980); *Laws v. Thompson,* 78 Md.App. 665, 673–674, 554 A.2d 1264 (1989), discloses the following material facts on which the summary judgment was based.

In September of 1984 appellant met with an employee recruiter for the appellee and with two persons in appellee's Business Planning Group, Mr. Everett G. Miller, and Ms. Teriko Goodwyn. At the conclusion of those interviews he was told that he would be hearing from them later.

Appellant was asked to return on September 28, 1984. He again met with Mr. Miller who advised him that appellee was prepared to offer him a position as a Principal Analyst in its Business Planning Group. On that day appellant completed an application for employment. The following paragraph prominently appeared above the line on which appellant signed the application:

I understand that, if I am employed, it will be for a trial period of three months; that, if in the judgment of the Company I am unsuitable during this period, the employment may be terminated by the Company without notice; and that, after this trial period, the employment may be terminated by either party at will upon two weeks' notice to the other. In any event, all obligation on the Company's part as respects salary shall end with the last day I work.

Appellant's employment by appellee was confirmed in a letter dated October 10, 1984, which he received from Mr.

R. G. Strother of appellee's Human Resources Department and Ms. Goodwyn. That letter stated:

> We would like to confirm our offer and your acceptance for the position of Principal Analyst in the Data Processing Department. In this position you will be reporting directly to Teriko Goodwyn, Acting Supervisor, and your starting salary will be $750.00/weekly, paid bi-weekly, with a starting date of October 15, 1984.
>
> We are very pleased that you are considering pursuing your career with USF & G. It is our firm belief that your skills, work experience, education, and potential will enable you to contribute to the continued success of USF & G. We equally believe that we as a Company can provide you with the opportunity for both professional and personal career advancement.
>
> As a routine procedure, we have initiated an investigation of your employment background. Our offer is contingent upon favorable verifications; however, we do not anticipate any problems.
>
> We would like you to respond to our offer with a written acceptance to Bob Strother, Human Resources Department, as soon as possible. In your acceptance letter, please confirm your actual starting date and Social Security Number. Along with your acceptance letter, please complete and return the attached Medical History Form. On your first day, please report to Bob Strother, in the Human Resources Department, on the 4th floor, at 9:00 a.m. At that time you will need to provide proof of age for enrollment in our Pension Plan, so please bring with you your Driver's License or original birth certificate.
>
> We would like to welcome you and wish you every success in your career with USF & G. If you have any questions regarding your offer, the position, or the Company, please don't hesitate to call either of us.

Appellant accepted this formal offer and went to work for appellee. For the first year of his employment appellant's

job performance was more than satisfactory to his supervisors.

Approximately two weeks after appellant began working for appellee, he attended an orientation program for new employees. At that time he received an employee handbook entitled "Employee's Guide to Personnel Practices." Under the section of the handbook entitled "Terminations" the following appears:

DISMISSALS

The Company intends to make every effort to avoid terminating an employee's service. It is recognized that dishonesty, misconduct or insubordination must be dealt with promptly. Dismissals for other causes are resorted to only after efforts to remedy the trouble have failed. Length of service is considered in determining the amount of notice or separation pay in lieu of notice but in no event will it be less than two weeks for employees with more than three months service. An effort is also made to provide time off to seek other employment before the termination becomes effective.

That personnel policy was in effect at the time appellant was employed by appellee, and it remained in effect through the date of his discharge.

During November of 1985 the Business Planning Group to which appellant had been assigned was disbanded, and appellant was transferred to the Capacity Planning Group, supervised by Ms. Kit Fechtig. Appellant's salary remained the same while his duties changed somewhat.

Appellant began to demonstrate deficiencies in his job performance shortly after his transfer to the Capacity Planning Group. In December of 1985 he failed to complete five of six assignments which he had been given by his supervisor. He was reprimanded by his supervisor on two occasions between December 10, 1985, and January 15, 1986. On one occasion he arrived late at work and left one hour early. On January 10, 1986, he took an extended lunch

break and missed a scheduled meeting with the superintendent of the Capacity Planning Group.

Appellant admitted that he missed the January 10, 1986, meeting in order to keep an appointment with the director of admissions at St. Agnes Hospital relating to a company he had organized in September of 1985 named "Caesar Software." Appellant formed that company with the participation of his fellow employees, Everett G. Miller and Mark Wolkow. They planned to develop and market software for a hospital operating room scheduling and management system. Miller and Wolkow each received 5% of the stock of Caesar Software for their work in getting the enterprise started. Appellant planned to issue 51% of the stock to himself for his services and to sell the other 39% of the stock to outside investors. By January 13, 1986, appellant, Miller, and Wolkow had been successful in selling $18,000 worth of the stock to their relatives and fellow employees at appellee. The three men also contracted with Carl Evans, another employee of appellee, to perform computer programming work for Caesar Software.

During late 1985 and early 1986 appellant worked 20 to 25 hours a week on the business of Caesar Software, but contended that none of this work was done during his working hours at appellee. He admitted that he discussed that business with Miller and Wolkow while at work for appellee, but stated that these discussions did not interfere with any of their duties. He further admitted that he made and received telephone calls concerning his outside enterprise while at work for appellee, but he testified that these calls were only for the purpose of arranging meetings after his working hours at appellee.

By January 13, 1986, the hierarchy of appellee had learned of appellant's involvement with Caesar Software. He was summoned to a meeting with Walter Zilahy, Vice President of appellee's data processing division, John Witzen, Vice President of appellee's internal audit division, and Frank Bossle, Assistant Vice President of appellee's inter-

nal audit division. They asked appellant to explain his involvement in Caesar Software which appellant did.

Mr. Zilahy was in charge of the investigation and had the ultimate authority to determine what action should be taken. Zilahy decided to fire appellant and did so on January 17, 1986. He also took disciplinary action against Miller, Wolkow, and Evans for their involvement in Caesar Software. They received written reprimands which were placed in their personnel files maintained by appellee.

## DISCUSSION

In *Adler v. American Standard Corp.*, 291 Md. 31, 432 A.2d 464 (1981), the Court of Appeals reaffirmed the common law rule that one who is employed for an indefinite duration may be discharged at any time at the pleasure of his employer. Nevertheless, when an employer communicates personnel policy statements to its employees which "... limit the employer's discretion to terminate an indefinite employment or that set forth a required procedure for termination of such employment ...", such statements, if justifiably relied on by its employee, may "... become contractual undertakings by the employer that are enforceable by its employee." *Staggs v. Blue Cross of Md., Inc.*, 61 Md.App. 381, 392, 486 A.2d 798 (1985), *cert. denied*, 303 Md. 295, 493 A.2d 349 (1985).

Appellant concedes, as he must, that when he applied for employment by appellee he knew, or should have known, that appellee disclaimed any intention of employing appellee for a fixed term or of limiting its discretion to terminate appellant's employment at its pleasure. That was unequivocally set forth in the application for employment which appellant completed and signed on September 28, 1984. Appellant contends, however, that appellee expressed a contrary intention in the letter addressed to him on October 10, 1984, by Mr. Strother of appellee's Human Resources Department and Ms. Goodwyn and in certain personnel policy statements made by appellee which appear in the "Employee's Guide to Personnel Practices" which appellant

received at the orientation program for new employees of appellee. We shall address each of those alternatives in turn.

## A. *The October 10 Letter.*

This letter, which we have quoted in full above, confirmed appellee's offer and appellant's acceptance of the position for which appellant applied on September 28, 1984. Appellant argues that appellee modified the at-will employment contract which he was offered on September 28 by not mentioning that type of employment contract in the letter and by the following statement which appears therein:

> We are very pleased that you are considering pursuing your career with USF & G. It is our firm belief that your skills, work experience, education, and potential will enable you to contribute to the continued success of USF & G. We equally believe that we as a Company can provide you with the opportunity for both professional and career advancement.

We are not persuaded.

The precatory language in the letter relied on by appellant falls far short of an expression by appellee of an offer of a unilateral contract of employment to appellant which only could be terminated by appellee for cause. These statements do not possess the contractual quality of those we reviewed in *Staggs v. Blue Cross of Md., Inc., supra.*

In *Staggs* the employer's personnel policy statement issued to its employees provided in pertinent part:

'IV. Employees terminating due to dismissal are subject to the following conditions:

A. Except in extreme cases when dismissal will be immediate, employees will be given at least two formal counseling sessions by their supervisors and/or manager before final dismissal. All formal counseling sessions must be first reviewed with the Employment and Employee Relations Department prior to any discussion with the employee. Formal counseling sessions with employees

must be substantiated in writing by filing form 5.65 Problem Solving Report with the Employment and Employee Relations Department. During the second counseling session, the employee will be advised that continuance of the problem may result in dismissal. Failure to sign form 5.65, Problem Solving Report after it has been discussed, may provide grounds for immediate dismissal.

. . . . .

E. An employee may be dismissed at any time for cause without liability to Blue Cross and Blue Shield of Maryland.'

*Id.* at 384–85, 486 A.2d 798.

We held that these provisions, if properly expressed and communicated, were offers of a unilateral contractual undertaking by the employer which, if accepted by the employee by continuing his employment, modified the original contract of employment which was terminable at the discretion of the employer. *Id.* at 392, 486 A.2d 798. In so holding, we hastened to add:

... Not every statement made in a personnel handbook or other publication will rise to the level of an enforceable covenant. As the Minnesota Court observed in *Pine River State Bank* [*v. Mettille* ], *supra,* 333 N.W.2d [622] at 626 [Minn.1983], 'general statements of policy are no more than that and do not meet the contractual requirements for an offer.'

*Id.* at 392, 486 A.2d 798.

In *MacGill v. Blue Cross of Md., Inc.,* 77 Md.App. 613, 551 A.2d 501 (1989), *cert. denied,* 315 Md. 692, 556 A.2d 673 (1989), we distinguished *Staggs.* In that case an employee sued his employer for breach of employment contract. He alleged that the employer had failed to comply with the personnel guidelines which it had published in filling three vacant positions for which he had applied. The employee contended that the following guidelines became contractual undertakings by the employer, modifying his contract of employment:

'1. Memo No. 200.60, requiring "each and every member of management to administer these [personnel] policies in a consistent and impartial manner."

2. Memo No. 200.45(C3), requiring certain vacant positions to be posted corporate wide; the personnel representative to screen applicants for minimum job qualifications; and the personnel representative to make a job offer to selected applicant and "promptly notify the remaining applicants of their status," "[i]f the decision is properly supported."

3. Memo No. 200,32(C2) endorsing and committing itself "to equal opportunity regardless of race, religion, color, age, sex, political affiliation, mental or physical handicap or national origin in employment ..."; "to take affirmative action to employ, advance in employment and otherwise treat qualified ... veterans of the Vietnam era without discrimination based upon their ... veteran status in all employment practices ..."; and "to be consistent in our practices of treating all employees and/or applicants, whether or not members of minority groups, equally according to their individual merit, qualifications, ability, experience, and other bona fide occupational standards".' (Footnote omitted.)

*Id.* at 615, 551 A.2d 501.

Rejecting the employee's view of these personnel guidelines, Judge Robert M. Bell, speaking for the Court, explained:

The long and short of this case is that the personnel policies relied upon by appellant as establishing contractual undertakings, on the part of appellee, that are enforceable by appellant, under the circumstances *sub judice,* simply are not sufficient. They are no more than 'general statements of policy', which do not, and indeed could not, 'meet the contractual requirements for an offer.' Personnel policies that specifically prescribe and limit the procedures that an employer must use in filling vacant positions, but do not prescribe with whom they are

to be filled, do not rise to the level of contractual undertakings. And they are not elevated to that status by allegations that one of the applicants is more qualified than the other applicants.

*Id.* at 620, 551 A.2d 501.

*See also Hillsman v. Sutter Community Hospitals of Sacramento,* 153 Cal.App.3d 743, 200 Cal.Rptr. 605 (3 Dist. 1984). In *Hillsman* the plaintiff claimed that a letter of understanding setting forth his terms of employment had modified his negotiated contract for at-will employment. He based that claim on the following language used by the employer in that letter: " 'We look forward to a long, pleasant, and mutually satisfactory relationship with you and the Sutter Community Hospitals'." *Id.* 200 Cal.Rptr. at 608. The Court held that this language was insufficient to constitute an offer of a contractual undertaking by the employer, stating that it was "... immediately apparent that the language relied on by plaintiff expresses a mere hope or expectation ..." and did not change plaintiff's at-will employment status. *Id.* 200 Cal.Rptr. at 609.

## B. *The Employee's Guide to Personnel Practices*

Appellant contends that the following provision appearing in the employee's handbook was an offer of contractual undertaking by appellee which, when accepted by appellant, modified his contract for at-will employment:

The Company intends to make every effort to avoid terminating an employee's service. It is recognized that dishonesty, misconduct or insubordination must be dealt with promptly. Dismissals for other causes are resorted to only after efforts to remedy the trouble have failed.

He asserts that he was fired without the benefit of any "efforts to remedy the trouble" required by this personnel policy of appellee.

In *Castiglione v. Johns Hopkins Hosp.,* 69 Md.App. 325, 517 A.2d 786 (1986), *cert. denied,* 309 Md. 325, 523 A.2d 1013 (1987), we considered a similar contention by a dis-

charged employee. The personnel policy provision there was also contained within an employee handbook which had been distributed to the employees of the hospital. That handbook, however, contained an express disclaimer by the employer:

'Finally, this handbook does not constitute an express or implied contract. The employee may separate from his/her employment at any time; the Hospital reserves the right to do the same.'

*Id.* at 329, 517 A.2d 786.

We distinguished *Staggs v. Blue Cross of Md., Inc., supra,* and affirmed the summary judgment entered in favor of the hospital on the employee's suit for damages for alleged breach of employment contract; we explained our reasoning:

The purpose of the *Staggs* exception to the at will doctrine is to protect the legitimate expectations of employees who have justifiably relied on manual provisions precluding job termination except for cause. Justifiable reliance is precluded where, as in the case at hand, contractual intent has been expressly disclaimed.

*Castiglione, supra,* 69 Md.App. at 341, 517 A.2d 786 (citation omitted). We believe that rationale is fully applicable to the case *sub judice.*

When appellant applied for a position with appellee, he acknowledged in writing that the employment he sought could be terminated by either the employer or employee "... at will upon two weeks' notice to the other." In light of that acknowledgement appellant could not justifiably rely on any indication in the employee manual that his employment would only be terminated after certain procedures were followed by appellee. The disclaimer of any contractual intent to the contrary on the part of appellee effectively barred such reliance.

The fact that in this case the disclaimer appeared in the application for employment rather than in the handbook itself is not a material distinction. *Reid v. Sears, Roebuck*

*and Co.,* 790 F.2d 453 (6th Cir.1986) is apposite. In that case the discharged employees had completed applications for employment which contained the following provision:

'In consideration of my employment, I agree to conform to the rules and regulations of Sears, Roebuck, and Co., and my employment and compensation can be terminated with or without cause, and with or without notice, at any time, at the option of either the Company or myself.'

*Id.* at 456.

The *Reid* court, applying Michigan law, agreed with Sears that the disclaimer in the application precluded the formation of a contract based on language contained in the personnel practices handbook which Sears had distributed to its employees:

The feature that distinguishes the present case from *Toussaint [v. Blue Cross & Blue Shield of Michigan,* 408 Mich. 579, 292 N.W.2d 880 (Mich.1980).] and all other Michigan decisions relied upon by the plaintiffs is the unequivocal language contained in the application for employment that each of the plaintiffs signed. *Toussaint* makes it clear that an employer can defeat claims that an employee could be discharged only for good cause by 'requiring *prospective employees* to acknowledge that they serve[ ] at the will or pleasure of the company....' 408 Mich. at 612, 292 N.W.2d 880 [, 891] (emphasis added). Since the acknowledgement should be obtained from prospective employees, Sears properly included this provision of employment in the application form rather than in some documents to be signed by the employee after he or she was hired.

*Id.* at 461.

*Schipani v. Ford Motor Co.,* 102 Mich.App. 606, 302 N.W.2d 307 (1981), which is relied on by appellant, is distinguishable. In that case the plaintiff, who was 53 years of age, was removed by Ford from his position as Superintendent of Production in 1977. Prior to accepting that management position, he had worked for Ford under a

union contract which provided him with job security. The written contract governing his employment in management provided, however, that he could be terminated at will by Ford at any time. Plaintiff alleged that he had been induced to sign that contract by oral promises of his employer that he could be employed until he reached age 65 and that Ford's "literature, policy and practices" also led him to believe that he would be employed until the normal retirement age of 65. In light of those alleged representations the court held that a jury question was presented as to whether Ford was estopped from relying on the provision in the written contract stating that plaintiff's employment was at will. There is no evidence in this case that appellant was induced to complete the application for employment by appellee by any representations that his employment could not be terminable at the will of appellee.

JUDGMENT AFFIRMED;

COSTS TO BE PAID BY THE APPELLANT.