655 A.2d 46

James ELLIOTT

v.

**BOARD OF TRUSTEES OF MONTGOMERY COUNTY COMMUNITY COLLEGE.**

No. 1002, Sept. Term, 1994.

Court of Special Appeals of Maryland.

March 6, 1995.

94

John J. Beins (Protas & Spivok, Chartered, on the brief), Bethesda, for appellant.

Darrell R. VanDeusen (Venable, Baetjer and Howard, Baltimore, Joyce R. Stern, County Atty., John S. Joseph, Asst. County Atty. and Joan I. Gordon, General Counsel–Montgomery College of Rockville, MD, on the brief), for appellee.

Argued before MOYLAN, BISHOP and CATHELL, JJ.

CATHELL, Judge.

Appellant, James Elliott, appeals from the judgment of the Circuit Court for Montgomery County (Cave, J., presiding), granting appellee's, the Board of Trustees of Montgomery County Community College's, Motion for Summary Judgment in this breach of employment contract case. Appellant presents the following questions on appeal:

A. Did Montgomery College's Policies and Procedures Manual create an enforceable employment contract between Montgomery College and its employee, James Elliott[?]

B. Did Montgomery College clearly and conspicuously disclaim any intent to create an enforceable contract by virtue of the Montgomery College Policies and Procedures Manual[?]

C. Did the trial Court err in finding, as a matter of law, that Montgomery College did not breach the contract created by its Employee Handbook[?]

D. Was the Trial Court precluded by the Maryland Administrative Procedures Act from allowing a jury to determine whether Mr. Elliott was terminated for cause[?]

Appellant was hired by Montgomery County Community College (the College) in 1979. He was promoted to a supervisory position in 1988. In 1992, a female employee charged appellant with sexual harassment. As a result, appellant was disciplined, an action that included a demotion and a transfer to the College's Germantown campus. A "last chance letter" was issued to appellant, which provided, in pertinent part:

It is very important that you understand that these actions are taken in the context of giving you a last chance to remain employed at Montgomery College. Any violation of ... College ... policy ... and procedures will lead to immediate disciplinary action, up to and including dismissal.

In February of 1993, appellant was charged with violating College policy by leaving work early without permission. The

College's "Policies/Procedures Manual" (P & P Manual) provides that employees are "[t]o report to work on time and stay until the end of the work day...." It is undisputed that appellant left his shift up to one hour early on four separate occasions. Appellant claimed that his immediate supervisor, John Day, gave him permission to leave work whenever he had completed his duties, even if this occurred before the end of his shift. Day claimed that he only gave appellant permission to do this during the "winter term" and the four occasions on which appellant was charged with leaving early took place after the "winter term" was over.

Day's supervisor filed a recommendation with the Director of Human Resources that appellant's employment be terminated. The Director approved the recommendation and notified appellant that he was terminated, effective April 2, 1993. Appellant filed a Notice of Appeal on March 23, 1993. An appeal hearing was thereafter held before Provost O. Robert Brown on the issue of whether cause existed to discharge appellant. Dr. Brown recommended that the dismissal be upheld and that recommendation was upheld by the Chief Administrative Officer of the College.

Appellant's supervisor gave him a copy of the P & P Manual to read when he first started working at the College in 1979. Appellant was issued his own P & P Manual when he was promoted to his supervisory position in 1988. That same year, the College issued a new P & P Manual. It is not clear when appellant's promotion occurred in relation to the distribution of the new manual. A two-page memorandum accompanied the new manual that provided, in part:

> The new manual, while similar in content to the old one, has been restructured to make it easier to use and update as follows....

It then listed six numbered paragraphs concerning the use of the manual, a paragraph concerning computer access, and then notes that:

The primary purpose of changing the format of the manual is to make it easier for you to use it as a reference document.

Conspicuously *absent* from the memorandum is any acknowledgement that the manual modification also changed the inherent nature of the employment relationship. No attempt was made to indicate that the new manual provided the following disclaimer in its introduction: "[The manual] does not contain all terms and conditions of employment nor constitute an express or implied employment contract."

After exhausting his remedies at the College, appellant filed this suit in the circuit court, alleging breach of an employment contract. Appellee filed a Motion for Summary Judgment, including with the motion an affidavit that provided that the handbook containing the disclaimer had been distributed to all employees eligible to receive it in 1988 and, thereafter, to each employee that had since become eligible to receive it. In support of his opposition to appellee's Motion for Summary Judgment, appellant provided an affidavit in which he stated that he had never seen the disclaimer. At the hearing held on the motion, appellant argued that the disclaimer might not have been distributed to all the College's employees that were entitled to receive the P & P Manual. The hearing judge reserved ruling on the motion to allow appellant more time for discovery. After appellant failed to provide any evidence that the manual containing the disclaimer had not been distributed as appellee had claimed, the hearing judge granted appellee's Motion for Summary Judgment.

### A. & B.

In *Castiglione v. Johns Hopkins Hosp.*, 69 Md.App. 325, 338, 517 A.2d 786 (1986), we stated:

In Maryland, an employment contract of indefinite duration is considered employment "at will" which, with few exceptions, may be terminated without cause by either party at any time. *Page v. Carolina Coach Co.*, 667 F.2d 1156 (4th Cir.1982); *Adler v. American Standard Corp.*, 291 Md. 31, 432 A.2d 464 (1981). In two limited situations an

"at will" employee may not be discharged without cause. First, the rule that employment contracts of indefinite duration can be legally terminated at any time is inapplicable where the employee is discharged for exercising constitutionally protected rights. . . . The second exception [was] adopted by this court in *Staggs v. Blue Cross of Maryland, Inc.,* 61 Md.App. 381, 486 A.2d 798 (1985), *cert. denied,* 303 Md. 295, 493 A.2d 349 (1985). . . . [Citations omitted.]

The exception to the employment at will doctrine that we adopted in *Staggs v. Blue Cross of Maryland,* 61 Md.App. 381, 486 A.2d 798, *cert. denied,* 303 Md. 295, 493 A.2d 349 (1985), was that an employee handbook may, in some circumstances, become an unilateral contract. In *Staggs,* we stated:

The question is whether the contracts in dispute here, which are otherwise of indefinite duration, have been so modified by the personnel policy statement as to remove them from the full strictures of the common law rule. . . .

There has been a great deal of litigation in recent years, throughout the country, over the effect of personnel handbooks and other types of policy statements issued by employers on "at will" employment agreements. Although there has yet to develop any uniform rule and the decisions vary somewhat, depending on the type of provision sought to be enforced and the theory pled by the employee, most of the more recent decisions seem to reflect the view that such unilateral pronouncements by an employer may create legally enforceable expectations on the part of its employees.

Perhaps the best exposition of this view is found in *Toussaint v. Blue Cross & Blue Shield of Mich.,* 408 Mich. 579, 292 N.W.2d 880, 892 (1980). The Court there began by confirming the general rule that indefinite hirings are terminable at the will of either party. It noted, however, that,

"While an employer need not establish personnel policies or practices, where an employer chooses to establish such policies and practices and makes them known to its employees, the employment relationship is presumably enhanced. The employer secures an orderly, cooperative

and loyal work force, and the employee the peace of mind associated with job security and the conviction that he will be treated fairly."

*Id.,* 292 N.W.2d at 892....

From this, the Court concluded that where the employer "had established a company policy to discharge for just cause only, pursuant to certain procedures, had made that policy known to Toussaint, and thereby had committed itself to discharge him only for just cause in compliance with the procedures," a jury could find that "[a]lthough Toussaint's employment was for an indefinite term ... the relationship was not terminable at the will of Blue Cross."

*Id.,* 61 Md.App. at 388–90, 486 A.2d 798 (some citations omitted). We adopted the Michigan court's *Toussaint* decision as the law in Maryland, finding support for doing so in *Dahl v. Brunswick Corp.,* 277 Md. 471, 356 A.2d 221 (1976). There, the Court of Appeals stated that an employer's "policy directive with respect to severance pay constituted an offer of a unilateral contract of which the employees were aware and, by continuing to work for Brunswick, accepted." *Id.* at 475, 356 A.2d 221. The Court added that "there is abundant support for the proposition that employer policy directives regarding aspects of the employment relation become contractual obligations when, with knowledge of their existence, employees start or continue to work for the employer." *Id.* at 476, 356 A.2d 221. *See also Hrehorovich v. Harbor Hosp. Center, Inc.,* 93 Md.App. 772, 793, 614 A.2d 1021 (1992), *cert. denied,* 330 Md. 319, 624 A.2d 490 (1993) ("Such personnel policies may give rise to contractual rights if ... properly expressed and communicated ... in a fashion that creates a reasonable basis for ... reliance on the provisions.").

In *Castiglione,* we noted that a disclaimer in an employee handbook may provide an exception to the *Staggs* rule, stating:

The handbook contained a statement that it "does not constitute an express or implied contract." ...

. . . .

... We cautioned ... [in *Staggs* ] that "[n]ot every statement made in a personnel handbook or other publication will rise to the level of an enforceable covenant." [61 Md.App.] at 392, 486 A.2d 798. . . .

The disclaimer language in the policy manual quoted in appellee's pleadings does not indicate any intent to limit the discretion of the appellee to discharge only for cause, as was the case in *Staggs*. Moreover, other portions of the manual quoted in appellee's memorandum actually served to reserve the rights of appellee "to direct and discipline our workforce ... and to take whatever action is necessary in our judgment to operate [the Defendant Hospital]." Finally, unlike the situation in *Staggs,* in this case the appellee expressly negated, in a clear and conspicuous manner, any contract based upon the handbook for a definite term and reserved the right to discharge its employees at any time. The provisions for review, when viewed in the larger context, were but "general policy statements" not amounting to an offer of employment for a definite term or requiring cause for dismissal.

69 Md.App. at 338–40, 517 A.2d 786 (some citations omitted).

■ Not every disclaimer in an employer's employee manual, however, will effectively disclaim contractual liability. In *Haselrig v. Public Storage, Inc.,* 86 Md.App. 116, 128, 585 A.2d 294 (1991), we noted that, in order for a disclaimer to be effective in preventing the formation of an employment contract, the disclaimer must be "clear and unequivocal. . . ." In *Haselrig,* the employer relied on two provisions in the employee handbook in support of its contention that it had effectively disclaimed any contractual liability in excess of that under the employment at will doctrine. One provision, under the heading captioned "Employment Relationship," provided:

The relationship between you and PSI is *predicated* on an at will basis. That is to say that either the Employee or the Company may terminate their employment at their discretion.

*Id.* at 120, 585 A.2d 294. The second provision was found in a section pertaining to a probationary period and provided:

> It should be understood that employment and compensation can be terminated, with or without cause and with or without notice at any time, at the option of either the Company or the Employee.

*Id.* at 120–21, 585 A.2d 294. In deciding that these two provisions were not, as a matter of law, adequate to disclaim the employee handbook as an implied contract, we stated:

> If we determine that the language of the provisions is ambiguous—an ambiguity exists when the language in the provision is, to a reasonably prudent layman, susceptible of more than one meaning, *Truck Insurance Exchange v. Marks Rentals, Inc.,* 288 Md. 428, 433, 418 A.2d 1187 (1980), or where the placement of the provisions in the handbook has that effect—and/or equivocal, then the issue of appellant's justification in relying on the other provisions is for the fact finder. Where the issue is, as it is here, the justiciability of an employee's reliance on a handbook, we must consider both the placement of the provisions in the handbook and the language of the provisions.

*Id.,* 86 Md.App. at 128, 585 A.2d 294.

█ The language of the disclaimer in the case *sub judice* is not ambiguous. Nor does the placement of the disclaimer cause one to question whether it applied to only a portion of the manual; its placement in the new P & P Manual's introduction clearly indicates its application to the manual as a whole.[1] Nevertheless, appellant proffers two reasons why the disclaimer was not, as a matter of law, sufficient. First, he claims that he never received the disclaimer. With respect to this contention, we note that it is not necessary that an employee actually read a disclaimer in order for it to be valid.

---

**1.** We nevertheless perceive that the better practice might well be to have such disclaimer language in bold print, at the very beginning of the introduction or in some other way *prominently highlighted* within the introduction.

■ We initially note that an employer is free to modify unilaterally the contractual relationship that it had previously established with its employees as a result of an employee manual. In *Castiglione,* 69 Md.App. at 335 n. 4, 517 A.2d 786, we responded to Castiglione's argument that the manual she was first issued did not claim a disclaimer by stating:

> Even if the review provisions of the manual in effect at appellant's initial hiring constituted an implied contract, . . . the later manual [which did have a disclaimer] would have superseded any earlier editions. By continuing to work for appellee after the new manual's issuance, appellant, by her conduct, impliedly would have assented to a modification of her employment agreement.[2]

The affidavit that appellee included in its Motion for Summary Judgment provided the undisputed fact that the disclaimer was distributed "College-wide in September 1988." The hearing judge provided appellant the opportunity to conduct discovery and submit evidence that this was not true. Appellant failed to submit any such evidence. While no Maryland appellate court has had the opportunity to address the issue of whether each individual employee must actually see the disclaimer, we note the concern the hearing judge expressed over creating such liability, namely, "It does not matter . . . whether he remembers getting it, whether he received it because everyone, then, can come in and say, 'I don't remember seeing it. I never got it.' If it was generally

---

2. While we do not need to resolve the issue here, we note that if an employer has the right to change its policy at any time—and generally it has that right—then a question exists as to what rights under what policy exist in the event that a new policy conflicts with the old policy and the new policy contains insufficient disclaimer language as to some of the employees. The hearing judge alluded to this when he stated at the hearing, "But there is no former contract if they changed the policy. It says it is the policy in effect at the time he is terminated, and that is exactly what it is, a policy, not a portion of the contract." The potential conflict exists, of course, primarily when an employer unilaterally changes its policy. If the disclaimer language is not sufficiently clear, does the policy revert back to the prior policy that is no longer the employer's policy? Thankfully, we need not now resolve this enigmatic legal question.

circulated, then that is what becomes the agreement, and the disclaimer is valid." We agree with Judge Cave on this point.

■ While other jurisdictions appear to be split over this precise issue, we find the rule adopted by the Michigan courts to be persuasive. In *Grow v. General Products, Inc.*, 184 Mich.App. 379, 457 N.W.2d 167, 170–71 (1990), *appeal denied,* 439 Mich. 871, 478 N.W.2d 92 (1991), the court affirmed the granting of a summary disposition, stating that "an employer may unilaterally change its employment termination policy so long as reasonable notice is given. *Reasonable* notification is not necessarily *actual* notification...." In *Transou v. Electronic Data System,* 767 F.Supp. 1392, 1399 (E.D.Mich.1991), *aff'd,* 986 F.2d 1422 (1993), the court granted the employer's motion for summary judgment, stating: "Though plaintiff claims that he does not recall receiving a copy of the handbook, its disclaimer is effective in light of the uniform and reasonable method of distributing the manual throughout the company." *Cf. Gaglidari v. Denny's Restaurants, Inc.,* 117 Wash.2d 426, 815 P.2d 1362, 1367 (1991) (reasonable notice would not include only giving handbooks with disclaimer to new employees). In the case *sub judice,* the undisputed evidence indicates that the P & P Manual containing the disclaimer was generally circulated College-wide in 1988. We hold that, in reference to disclaimers in employee handbooks or manuals, reasonable notification, not actual notification, is sufficient to put the employee on notice of the disclaimer. We further hold that a uniform, system wide distribution of a disclaimer will generally constitute reasonable notice thereof.

Appellant also claims that the memorandum that accompanied the new P & P Manual in its dissemination "did nothing to place employees on notice of the dramatic change in their legal rights vis-a-vis their employer" and lulled the employees "into a false sense of security." We agree.

In *Castiglione,* 69 Md.App. at 340, 517 A.2d 786, we stated that a disclaimer must be both clear and conspicuous. Had the memorandum in the case at bar not been a part of the general distribution or had the memorandum specifically ref-

erenced the importance of the disclaimer language, we would have no problem deciding that the disclaimer at issue here was clear and conspicuous by reason of its placement in the manual, *i.e.*, its language is clear and it is placed in the introduction.

The purpose of a disclaimer is to point out to such an employee that an important change has occurred. The memorandum at issue here, however, mutes the effectiveness of the disclaimer. The memorandum does, and may have been designed to do, just the opposite of directing the attention of the employee to, what may well be, the most important change. Because the effect of the memorandum was to minimize the importance of what was, if not the most important provision in the new manual, at least a very important change, we do not believe, considering the totality of the circumstances, that the disclaimer was sufficiently conspicuous in the case *sub judice*. The memorandum provided that the new manual was "similar in content to the old one", and "[t]he primary purpose of changing the format of the manual is to make it easier to use...."

In *Government Employees Ins. v. Ropka*, 74 Md.App. 249, 267, 536 A.2d 1214 (1988), we noted that, with respect to insurance policies, "[m]ost jurisdictions impose an affirmative duty on the insurer to make the insured aware of changes inserted into a renewal policy...." We noted that the rationale behind this was:

> When an insured purchases an original policy of insurance he may be expected to read it and the law may fairly impose upon him such restrictions, conditions and limitations as the average insured would ascertain from such reading. However, where the stated period of coverage in the original policy is about to expire and the insurance company simply sends a renewal policy for the new period of coverage, the insured, in all likelihood, will not read it over again and may not fairly be expected to do so. Absent notification that there have been changes in the restrictions, conditions or limitations of the policy, the insured is justly entitled to

assume that they remain the same and that his coverage has not in anywise been lessened.

*Id.* at 268, 536 A.2d 1214 (quoting from *Bauman v. Royal Indemnity Co.*, 36 N.J. 12, 174 A.2d 585, 591–92 (1961)).

 Essentially, the memorandum in the case *sub judice* indicated that the changes in the manual were ones of form and not substance. We believe that, because of the memorandum, the College's employees would not have been likely to examine closely the contents of the new manual that was described as roughly the size of a telephone book. *See Swanson v. Liquid Air Corp.*, 118 Wash.2d 512, 826 P.2d 664 (1992) (The court held that a disclaimer placed on page 6 of a 200 page manual was not effective as a matter of law. The court considered it relevant that the manual was accompanied by a cover letter that failed to mention the disclaimer.) We do not hold that, in order for the employer to disclaim contractual liability as a matter of law, the employer must provide a separate letter, in addition to the manual containing a conspicuously placed and clear disclaimer. Rather, we merely note that, when the employer makes an affirmative statement that the manual is similar to a previous one and is designed merely to make it easier to use, the circumstances are such that an employee would not be likely to review the manual to ascertain whether important changes to the very nature of his employment relationship have been made. The disclaimer here changed the very nature of the relationship from an implied continuing contract unless good cause for termination exists to an at will contract. Therefore, because of the memorandum that down played the significance of the new P & P Manual, we hold that the disclaimer was not, as a matter of law, conspicuous and, thus, the issue of whether appellant received notice of the disclaimer was a matter to be determined by the finder of fact in the context of a resolution of whether the employment relationship had changed.

## C. & D.

Our holding above does not dispose of this case because the hearing judge found, in the alternative, that, even if an implied

contract existed, *i.e.*, even if the disclaimer was ineffective to change the employment relationship, there was no breach of that prior implied contract because appellant received all that he was entitled to under the employment relationship created by implication from the former policy and pre-modified manual.

Appellant was discharged for leaving his shift early without his supervisor's permission. Appellant contends, however, that he, in fact, had his supervisor's permission. Appellee cites *H & R Block, Inc. v. Garland*, 278 Md. 91, 99–100, 359 A.2d 130 (1976), and *MacGill v. Blue Cross*, 77 Md.App. 613, 619–20, 551 A.2d 501, *cert. denied*, 315 Md. 692, 556 A.2d 673 (1989), apparently for the proposition that, once the College determined that it had "cause" to discharge appellant, the courts could not disturb this finding, absent some evidence of bad faith on the part of the College.

The above cited cases stand for the proposition that, if an employer has contracted to do something that requires it to exercise its discretion, then it must exercise that discretion in good faith. In *Garland*, the issue was whether H & R Block had found Garland's performance "satisfactory." The Court held that, since there was no evidence that H & R Block had not acted in good faith, its motion for a directed verdict should have been granted. In *MacGill*, the issue MacGill attempted to raise on appeal was whether he was the "most qualified" so as to have been entitled to the promotion for which he applied. We noted, in response to MacGill's contention:

> Were such allegations accepted as sufficient, the courts would necessarily become involved in the assessment of the propriety and soundness of a company's personnel decisions; the courts would be required to act as super personnel officers, overseeing and second-guessing the company's decisions whenever an unsuccessful applicant perceives him— or herself to have been the most qualified applicant.

*MacGill*, 77 Md.App. at 620 n. 3, 551 A.2d 501.

■ We glean from *Garland* and *MacGill* that, absent evidence of bad faith on the part of an employer, courts should

be reluctant to overturn an employer's decision to discharge an employee when the employer has complied with its own procedures for resolving matters such as this.

■ We have exhaustively examined the exhibits contained in the extract, including the complaint, motions, responses, and affidavits. We have found absolutely no allegations below by appellant of "bad faith" on the part of the employer. There is nowhere contained in the affidavits in opposition to the appellee's motion any proffer of any evidential matter that would even pertain to any assertion of "bad faith." The complaint failed to assert bad faith in the first instance. So long as an employer follows its policy stated procedures and acts in good faith in determining what is good cause as to the formulation of its disciplinary measures and then, using the proper procedures, in good faith, applies its standards to the facts presented, there is no actionable wrong.

■ The potential issue for a jury is not what constitutes good cause. A jury cannot establish a good cause for separation separate and apart from the agreement of the parties— or, in this case, the unilateral policy of the employer. It is for the parties, or, as in this case, for the employer, through policy statements, to establish what is good cause and the procedures to be followed in determining whether good cause (and not some other cause, or lack thereof, perceived to be appropriate or inappropriate by a fact finder independent of the employer's policy) exists.

The Court of Appeals opined in *Suburban Hosp., Inc. v. Dwiggins*, 324 Md. 294, 307, 596 A.2d 1069 (1991):

By creating and disseminating its grievance procedures, Suburban promised merely that they would be followed. . . .

. . . In the case before us the hospital lived up to its obligations to Dwiggins by acting in accordance with every step in its grievance system. Having done that, Suburban owed Dwiggins nothing more.

Quoting from *Meleen v. Hazelden Foundation,* 740 F.Supp. 687 (D.Minn.1990), *aff'd,* 928 F.2d 795 (8th Cir.1991), the Court continued:

> "... But, this was a private contract; no right to constitutional due process or proof beyond a reasonable doubt existed. Plaintiff's private expectations and due process concepts are not part of the employment contract."

*Id.,* 324 Md. at 308, 596 A.2d 1069. The Court then held:

> An employer may limit his right to terminate a worker by establishing virtually any disciplinary procedure. But courts must not read more into the procedure than is there. Unless some public policy is implicated, employee grievance mechanisms should be analyzed only for what they offer; they must not be seen automatically as quasi-judicial forums for final and impartial dispute resolution governed by standards of due process and neutral fairness.

Id. at 310, 596 A.2d 1069.

The determination as to whether liability attaches depends upon whether the employer has followed its stated procedures and, where its manual-generated policy requires the employer to act in good faith, has acted in good faith in determining good cause. If it has satisfied those two criteria, no action will lie. Even when there is conflicting evidence, so long as the employer acts in good faith pursuant to its proper procedures, the fact that a different inference from the evidence might be made does not create an issue to be submitted to a judicial fact finder. Only in instances when the employer's policy promises a good faith application, if there are allegations of bad faith in the resolution of the conflicting evidence, or evidence, or evidentiary proffers properly made of such bad faith, would such an issue result in a triable action. To hold otherwise would be to put the courts in the position of making, as we said in *MacGill,* "personnel decisions," acting as a "super personnel officer," or of "second-guessing a company's decisions," even when the company follows its procedures and does so in good faith. The hearing court appeared to recognize this initially, as it opined:

The Court is further of the opinion that even if [appellant's] employment for an indefinite period had [not] been modified by the personnel policy statement, unlike the situation in *Staggs*, [appellant] was afforded his contractual remedy of a hearing and review. [Appellee], Montgomery College, therefore complied with the provisions of the policy and procedure statement.

The hearing court, however, apparently referring back to the hearing where it discussed its beliefs that "in any other case [where] they have provided ... an administrative procedure" and "[a]ny other agency ... the matter would be ... an administrative appeal," added in its opinion:

Whatever mistaken beliefs [appellant] may have had, that he did not have to work the full shift, the decision of the Director of Human Resources and the Chief Administrative Officer should be treated *in the nature* of an Administrative Appeal. If there were any facts to support the decision made on behalf of [appellee], this Court should not substitute its opinion for that of the representative of the [appellee]. [Emphasis added.]

 Appellant contends that the hearing court erroneously invoked the Administrative Procedure Act in holding the court should not substitute its judgment for that of appellee's representative, if there were any facts in the record to support the decision. Despite the fact that the hearing judge's choice of language refers to administrative procedures not normally applicable to civil contract causes of action, as we perceive its use in the context of the opinion, he was primarily commenting on the lack of any assertion as to "bad faith" on the part of the appellee. The hearing judge's comments as to the affording of appellant's procedural rights by appellee was indicative of the fulfillment of the specific contractual obligation. We disagree with the proposition that the hearing judge applied the Administrative Procedure Act's standards in this case. Rather, the hearing judge simply indicated that, if there were a contract, appellant received that to which he would have been entitled— namely, the right to invoke the procedure set forth in the manual and the right to require appellee to exercise good faith

in following that procedure. *See Hicks v. Methodist Medical Center*, 229 Ill.App.3d 610, 170 Ill.Dec. 577, 593 N.E.2d 119 (1992) (disclaimer was not effective but there was no breach of contract because the employer had followed the grievance procedure). As there was absolutely no evidence, or proffer, of bad faith on the part of the employer and it was uncontradicted that the employer followed its own stated procedures and it was uncontradicted that there was some evidence supporting a termination for cause, the hearing court did not err in its ruling on the motion.

Causes of action arising out of employment relationships implied from employee manuals are not actions in which judicial fact finders are free to make determinations as to what constitutes good cause independent of the manuals and the employer's policy. As we have said, such causes of action are to determine primarily whether the employer has, in good faith, complied with the practices and procedures created by the manual and made a good faith resolution supported by sufficient evidence. Only in the presence of a failure to comply with stated or implied practice or procedures, insufficient evidence, or bad faith in the resolution of the matter may a judicial fact finder be substituted for the employer.

Appellee claimed for the first time on appeal that this suit was barred under the doctrine of sovereign immunity. Because we hold the hearing court did not err in granting appellee's Motion for Summary Judgment, we do not find it necessary to resolve this issue.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**