**Robert Douglas CONKWRIGHT**

v.

**WESTINGHOUSE ELECTRIC CORP.**

No. N–88–3350.

United States District Court,
D. Maryland.

May 30, 1990.

---

Phillips P. O'Shaughnessy, Paul W. Spence and Sandbower, Gabler & O'Shaughnessy, P.A., Baltimore, Md., for plaintiff.

Monte Fried, Rosemary A. Gladue, and Frank, Bernstein, Conaway & Goldman, Baltimore, Md., for defendant.

NORTHROP, Senior District Judge.

This is an age discrimination case involving a reduction in work force at defendant Westinghouse Electric Corporation's ("Westinghouse") facilities at Baltimore–Washington International Airport ("BWI") and in Hunt Valley, Maryland. Westinghouse hired plaintiff, Robert Douglas Conkwright ("Conkwright") in 1967 at the age of 42 to fill a series of marketing positions within the company until 1981.[1] In 1982, on his own initiative, Conkwright sought and secured a transfer as a division special representative to the Contracts Management section of the Integrated Logistics Support Divisions ("ILSD") of Westinghouse's Defense and Electronics Center ("D & EC"). From that time until mid–1985, Conkwright's work focused on domestic programs with some additional international orientation.

Westinghouse was advised, in August, 1985, that it had lost a major defense contract known as "DIVADS".[2] Since the Contracts Division had some management responsibility on the DIVADS program, a reorganization became necessary to accommodate the expected loss. Following the reorganization and after reviewing the impact of the loss of the DIVADS contract, Westinghouse management elected to conduct a reduction in work force ("RIF") for D & EC. As a function of the impending

---

1. Westinghouse argues that Conkwright's entire work history within the company is relevant to the disposition of this motion. However, consideration of Conkwright's employment record shall be limited to his work in Contracts Management—the group to which he was assigned at the time of his layoff.

2. DIVADS is an abbreviation for Division Air Defense System ("DIVADS") program. DIVADS was a defense system designed to aid U.S. Army tanks to repel helicopters carrying missiles. Westinghouse was developing a radar system for DIVADS as a subcontractor to Ford Aerospace.

RIF, divisions managers and directors were assigned a certain number of employees to be eliminated from the previously authorized management and professional head count within their groups. Managers were permitted to "credit" unfilled requisitions, quits, transfers and retirements towards any required reduction in their workforce. The director of Contracts Management, ILSD, subtracting the "credited" positions, determined that three professional employees should be targeted for layoff. Lower level managers within Contract Management were instructed to identify the "lowest rated" employees within their groups. The three lowest rated employees were to be included in the layoff nomination. Conkwright was among the three employees found to be the lowest rated.

Thereafter, D & EC management personnel met to discuss the impending RIF, the reasons for it, and the basis for selecting targeted employees. Westinghouse's in-house labor counsel reviewed anti-discrimination laws, including ADEA, with all managers. Managers were informed that layoffs were to be based on employee performance. Prior to implementing the RIF, Westinghouse created a committee of four upper-level management personnel to review the proposed list of lowest performing employees. A member of the committee questioned Conkwright's presence on the nomination list. After consultation with Conkwright's immediate supervisor, it was confirmed that his nomination was based solely on work performance. Thus, Conkwright remained on the list.

On November 8, 1985, Conkwright was advised that his layoff would be effective December 6, 1985. At that time, it was explained to Conkwright that the basis of the layoff was work performance and that his employee ratings were among the lowest within his group. After consulting a Westinghouse group designed to assist employees with the layoff, Conkwright chose early retirement effective January 1, 1986.

Three months later, on March 7, 1986, Conkwright filed an age discrimination charge with the Maryland Commission on Human Relations ("MCHR"). Following a "fact finding" conference, on July 22, 1988, the MCHR issued a probable cause finding that Conkwright's termination was likely based on his age. This lawsuit was filed on November 7, 1988. Following extensive discovery, Westinghouse moved for summary judgment. (Paper Number 16). Conkwright opposes the motion and a reply has been filed. (Paper Numbers 17 and 18). Conkwright claims Westinghouse's termination of his employment was in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* At the time of his termination, Conkwright was sixty years of age. Conkwright seeks an award of back pay, front pay, attorneys' fees, and other relief under the ADEA. Additionally, Conkwright contends that his termination violated Section 510 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* Finally, plaintiff asserts pendent state law claims of abusive discharge and breach of employment contract.

Both parties have submitted exhaustive memoranda accompanied by voluminous exhibits; numerous lengthy depositions have taken place. After careful consideration of these materials, this Court finds that no hearing is necessary. Local Rule 105.6. For the reasons stated below, Westinghouse's motion for summary judgment shall be granted.

## I. SUMMARY JUDGMENT PRINCIPLES

The standard applicable to motions for summary judgment is clear. Under Federal Rule of Civil Procedure 56, to grant a motion for summary judgment, the Court must find that the pleadings, together with the depositions, interrogatories and affidavits on file, establish that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Barwick v. Celotex Corp.*, 736 F.2d 946, 958 (4th Cir.1984); *Purity Products, Inc. v. Tropicana Products, Inc.*, 702 F.Supp. 564, 567 (D.Md. 1988), *aff'd*, 887 F.2d 1081 (4th Cir.1989); *Pfeifer v. Lever Bros.*, 693 F.Supp. 358, 362 (D.Md.1987), *aff'd*, 850 F.2d 689 (4th Cir. 1988). A party seeking summary judg-

ment bears the initial burden of specifying the basis upon which it contends judgment should be granted and of identifying that portion of the record which, in its opinion, demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Charbonnages De France v. Smith,* 597 F.2d 406, 414 (4th Cir.1979). The non-moving party must thereafter produce specific facts demonstrating a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *White v. Rockingham Radiologists, Ltd.,* 820 F.2d 98, 101 (4th Cir.1987).

The Supreme Court has emphasized that Rule 56 mandates the entry of summary judgment "after adequate time for discovery ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552. Thus, "the inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2509–10. In making that analysis, the evidence and all justifiable inferences therefrom must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970); *Gill v. Rollins Protective Services Co.,* 773 F.2d 592, 595 (4th Cir.1985), *reh'g denied,* 788 F.2d 1042 (4th Cir.1986).

The Supreme Court explained the summary judgment standard by stating:

[T]he judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512; *Pfeifer,* 693 F.Supp. at 362.

The Fourth Circuit has recognized that trial judges have "an affirmative obligation ... to prevent 'factually unsupported claims and defenses' from proceeding to trial". *Felty v. Graves–Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir.1987) (citing *Celotex,* 477 U.S. at 323–25, 106 S.Ct. at 2553). Furthermore, the Fourth Circuit in *Ballinger v. North Carolina Argric. Extension Serv.,* 815 F.2d 1001 (4th Cir.), *cert. denied,* 484 U.S. 897, 108 S.Ct. 232, 98 L.Ed.2d 191 (1987), addressed the appropriateness of granting a summary judgment motion in employment discrimination cases. The Court stated:

We have emphasized repeatedly the drastic nature of the summary judgment remedy and have held that it should not be granted unless it is perfectly clear that there are no genuine issues of material fact in the case ... Further, since 'summary judgment is seldom appropriate in cases wherein particular states of mind are decisive as elements of [a] claim or defense,' ... courts must take special care in cases such as the instant one because motive often is the critical issue in employment discrimination cases. Nevertheless, '[t]he fact that motive is often the critical issue in employment discrimination cases does not mean that summary judgment is *never* an appropriate vehicle for resolution.' ... This is so because '... the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.'

*Ballinger,* 815 F.2d at 1004–05 (emphasis in the original), *quoting International Woodworkers of America, AFL–CIO v. Chesapeake Bay Plywood Corp.,* 659 F.2d 1259, 1272 (4th Cir.1981); *Anderson,* 477 U.S. at 247–48, 106 S.Ct. at 2509–10.

Applying these principles to the facts of record in this case, this Court concludes

that Westinghouse's motion for summary judgment must be granted.

## II. MERITS

### A. *ADEA Statute of Limitations*

■ As a threshold issue, Westinghouse submits that Conkwright's ADEA claim is beyond the statute of limitations governing ADEA claims. Section 7(e) of ADEA, 29 U.S.C. § 626(e), creates a two year statute of limitation for ADEA claims unless the claim alleges "willful conduct" for which a three year limitation period is provided. 29 U.S.C. § 626(e) (1985 Supp.1990) (adopting the statute of limitations under the Portal-to-Portal Pay Act, 29 U.S.C. § 255(a)). Westinghouse argues that Conkwright failed to file this action within the two year limitation and, therefore, must either satisfy the "willful" element of the three year limitation period or invoke the protection of the Age Discrimination Claims Assistance Act ("ADCAA"), Pub.L. 100–283, 102 Stat. 78 (April 7, 1988). It is clear that by filing this action on November 7, 1988, Conkwright exceeded the two year limit. His cause of action accrued on November 8, 1985—the date Conkwright was informed of his impending layoff. Therefore, Conkwright's ADEA claims are time barred unless he invokes the aid of ADCAA or has sufficiently alleged a willful violation of ADEA. This Court need not reach Westinghouse's arguments on "wilfulness" since Conkwright's claims fall under the protection of ADCAA.

For a 540 day period, beginning April 7, 1988, the ADCAA creates a window of time extending the two year limitations period applicable to ADEA claims if certain criteria are met. Section 3 of the ADCAA states:

> Notwithstanding [29 U.S.C. § 626(e)], a civil action may be brought ... by ... an aggrieved person, during the 540-day period beginning on the date of enactment of this Act [April 7, 1988] if—
>
> (1) with respect to the alleged unlawful practice on which the claim in such civil action is based, a charge was timely filed under such Act with the Commission after December 31, 1983,
>
> (2) the Commission did not, within the applicable period set forth in [29 U.S.C. § 626(e)] either—
>
> (a) eliminate such alleged unlawful practice by informal methods of conciliation, conference, and persuasion, or
>
> (b) notify such person, in writing, of the disposition of such charge and of the right of such person to bring a civil action on such a claim,
>
> (3) the statute of limitations applicable under [29 U.S.C. § 626(e)] to such claim ran before the date of enactment of this Act [Apr. 7, 1988], and
>
> (4) a civil action on such claim was not brought by the Commission or such person before the running of the statute of limitations.

Age Discrimination Claims Assistance Act, Pub.L. No. 100–283, 102 Stat. 78. (1988). Without question, Conkwright meets the requirements set forth in (1), (3) and (4). Additionally, the evidence in this case demonstrates that Conkwright received notice of the MCHR final disposition when its findings of fact were entered on July 22, 1988. The Commission did not, within the two year statute of limitations, notify Conkwright of its disposition of his claim or his right to bring a civil action. Therefore, Conkwright would appear to be entitled to invoke the extension provisions of the ADCAA.

Westinghouse, however, disputes Conkwright's eligibility under ADCAA. Relying on an unpublished opinion of the United States District Court for the Northern District of Illinois, Eastern Division, *Turgeon v. Rush–Presbyterian–St. Luke's Medical Center*, No. 89 C–7377, 1989 WL 157518 (N.D.Ill. Dec. 12, 1989) (J. Kocoras) (LEXIS 14856, Genfed library, Dist. file), 51 Fair Empl.Prac.Cas. 933 (BNA), Westinghouse argues that Conkwright is not among those claimants the ADCAA was designed to protect. Under Westinghouse's theory, only claimants who were "completely ignorant" of their rights under ADEA may invoke the ADCAA. Westinghouse points to the fact that Conkwright consulted independent counsel prior to filing his administrative claims, and thus had knowledge of the limi-

tations period. Although the Commission did not provide notice as set forth in Section 3(2)(B) of ADCAA, Westinghouse submits that Conkwright's own personal knowledge of his legal rights prevents him from invoking the ADCAA. This is a strained construction of the Act. Congress intended to protect a class of claimants who, because of the administrative backlog of cases filed with the EEOC, was never notified by the Commission of their legal rights to maintain a civil action. There is no indication whatsoever to suggest the Congress intended to exclude claimants who, by the virtue of personal knowledge independent of information communicated by the EEOC, were aware of their rights to file a civil action. Accordingly, this Court finds that Conkwright is entitled to invoke the extension provisions of the ADCAA and, thus, this case is properly before this Court. This Court shall now turn to the merits of this action.

### B. Count I—ADEA

■ To establish a colorable action under the ADEA, Conkwright must prove, *inter alia*, that, but for Westinghouse's intent to discriminate against him because of his age, he would not have been laid off. *Goldberg v. B. Green and Co., Inc.*, 836 F.2d 845, 847 (4th Cir.1988); *Lovelace v. Sherwin-Williams Co.*, 681 F.2d 230, 238 (4th Cir.1982), *quoting from Spagnuolo v. Whirlpool Corp.*, 641 F.2d 1109, 1112 (4th Cir.), *cert. denied*, 454 U.S. 860, 102 S.Ct. 316, 70 L.Ed.2d 158 (1981); *see also Wilhelm v. Blue Bell, Inc.*, 773 F.2d 1429, 1432 (4th Cir.1985), *cert. denied*, 475 U.S. 1016, 106 S.Ct. 1199, 89 L.Ed.2d 313 (1986); *E.E.O.C. v. Western Electric Co. Inc.*, 713 F.2d 1011, 1014 (4th Cir.1983). The Fourth Circuit Court of Appeals recognized that in age discrimination case a plaintiff may prove the defendant's intent to discriminate in one of two alternative methods:

> [The plaintiff] may meet [his] burden 'under ordinary principles of proof by any direct or indirect evidence relevant to and sufficiently probative of the issue.' ... Alternatively, [he] may rely on the judicially created proof scheme for Title VII

cases ... which has been adapted for application in ADEA litigation.

*Goldberg*, 836 F.2d at 847–48; *Lovelace*, 681 F.2d at 239; *Wilhelm*, 773 F.2d at 1432. Thus, for Conkwright to meet his burden under "ordinary principles", he must produce "direct evidence of a stated purpose to discriminate and/or circumstantial evidence of sufficient probative force to reflect a genuine issue of material fact". *Id.* at 848. Since there is no direct evidence that Westinghouse intended to discriminate against him on the basis of his age, Conkwright must rely on the judicially created proof scheme. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

■ A three stage proof scheme was created in *McDonnell Douglas*. In *Western Electric*, the Fourth Circuit described the three stage process of *McDonnell Douglas*:

> First, the plaintiff must establish a 'prima facie case.' By establishing a 'prima facie case', the plaintiff creates a rebuttable 'presumption that the employer unlawfully discriminated against' him, and the burden of producing evidence on the issue shifts to the defendant ... The defendant, at stage two, must rebut 'the presumption by producing evidence that the plaintiff was [demoted] ... for a legitimate, nondiscriminatory reason.' ... The employer is not required to prove absence of discriminatory motive, but merely articulate some legitimate reason for its action ... If the defendant's evidence carries this burden, the presumption in favor of the plaintiff is destroyed ... At the third stage, the plaintiff bears the burden of demonstrating that the proffered reasons were pretextual or untrue ... This burden merges with the plaintiff's ultimate burden of persuasion on the motivation issue.

*Western Electric*, 713 F.2d at 1014 (citations omitted); *see also Herold v. Hajoca Corp.*, 864 F.2d 317, 319 (4th Cir.1988), *cert. denied*, — U.S. ——, 109 S.Ct. 3159,

104 L.Ed.2d 1022 (1989); *Fink v. Western Electric Co.*, 708 F.2d 909, 915 (4th Cir. 1983); *Lovelace*, 681 F.2d at 240–41. The elements of a "prima facie" case in the usual ADEA case are: (1) that plaintiff is in the protected age group [3]; (2) that plaintiff was discharged or demoted; (3) at the time of discharge or demotion, plaintiff was performing his job at a level that met his employer's legitimate expectations; and (4) that following his discharge or demotion, he was replaced by some one of comparable qualifications outside the protected class. *Western Electric Co.*, 713 F.2d at 1014; *Lovelace*, 681 F.2d at 239–41. "It is readily apparent that the fourth element will not fit in most reduction-in-force cases." *Western Electric Co.*, 713 F.2d at 1014; *McCorstin v. United States Steel Corp.*, 621 F.2d 749 (5th Cir.1980). In this case, the fourth element is not applicable. Conkwright, however, must demonstrate, as an alternative to the traditional fourth element, evidence that either (a) persons outside the protected age class were retained in the same position or (b) that his employer did not treat age neutrally in selecting him for layoff. *Western Electric Co.*, 713 F.2d at 1015; *Fink*, 708 F.2d at 916–919; *Williams v. General Motors Corp.*, 656 F.2d 120 (5th Cir.1981), *cert. denied*, 455 U.S. 943, 102 S.Ct. 1439, 71 L.Ed.2d 655 (1982).

In measuring the evidence submitted by the parties on a motion for summary judgment in an ADEA case, a court must act conscientiously since particular "states of mind" are at issue. This Court, however, has recognized, in some circumstances, that summary judgment is appropriate:

> [D]isposition of an ADEA suit under Rule 56 is appropriate if as a matter of law the plaintiff cannot prevail. As the Court stated in *Douglas v. Anderson*, 656 F.2d 528 (9th Cir.1981): We recognize that summary procedures should be used judiciously, particularly in cases involving issues of motivation or intent ... On the other hand, we agree with the Seventh Circuit that one purpose of the allocation of burdens of proof and production in Title VII and ADEA actions is to help district courts to identify meritless suits and to stop them short of full trial.

*Pfeifer v. Lever Bros. Co.*, 693 F.Supp. 358, 363 (D.Md.1987), *aff'd*, 850 F.2d 689 (4th Cir.1988); *see also Ballinger*, 815 F.2d at 1004–05. Based on the evidence, this Court concludes as a matter of law Conkwright fails to establish a prima facie case of age discrimination because, at the time of his layoff, he was not performing his job at a level which met defendant's legitimate expectations. Assuming *arguendo*, that Conkwright produced sufficient evidence on the prima facie case elements, the record amply supports the conclusion that Westinghouse has articulated a legitimate nondiscriminatory reason for laying off Conkwright. Additionally, no evidence has been produced demonstrating a genuine issue of material fact as to whether Westinghouse's stated reasons were a mere pretext concealing discrimination.

### 1. Plaintiff's prima facie case

■ Westinghouse amply demonstrates, based on the admissible evidence, that Conkwright, at the time of his selection for layoff, was not performing at a level that met his employers' legitimate expectations. In fact, Conkwright had failed to meet legitimate expectations for over two years preceding his nomination for layoff. It is undisputed that each of Conkwright's performance appraisals, completed while in his position within Contracts Management, indicated that he "required improvement".[4]

---

**3.** ADEA protects persons between the ages of forty and seventy. *See* 29 U.S.C. § 631 (1985 Supp.1990).

**4.** In October 1982, following his initial arrival in Contracts Management, Conkwright's was a "2 performer". Exhibit 12, 1982 Performance Evaluation—Motion of Defendant for Summary Judgment (Paper Number 16). The evaluation, however, noted that Conkwright recently transferred into the division and had yet to accumulate experience to fully adjust. Conkwright's ratings during the years 1984 and 1985 were done by his immediate supervisor, Henry J. MacLaughlin ("MacLaughlin"). Those evaluations yielded the following ratings: (1) January, 1984—1.9; (2) December, 1984—2.1; and (3) September, 1985—2.5. *Id.*, Exhibits 13–14. Westinghouse's performance evaluations use a

Conkwright was told specifically in early 1985 that his work performance was not producing acceptable results. Both his immediate supervisor, MacLaughlin, and Dr. C. M. Pfiefer ("Pfiefer") informed Conkwright of his low rated performance.[5] Thus, at the time Westinghouse selected persons for the impending RIF, Conkwright was legitimately targeted as a low performing employee. Westinghouse selected three persons, all the lowest rated employees in Contracts Management, for layoff from the MacLaughlin group.[6] The evidence adequately demonstrates that in November, 1985, Conkwright was not meeting his employer's legitimate performance expectations.

Conkwright, in opposition to the motion for summary judgment, points to certain evidence which, in his opinion, raises a genuine issue of material fact concerning whether he was performing his job such as to met "legitimate expectations". Among the facts Conkwright relies upon are (1) an alleged "admission" by MacLaughlin that Conkwright was "meeting expectations" at the time he was laid off; (2) the MCHR

findings of fact of probable cause; (3) the unanimous opinion of coworkers that Conkwright was a "solid performer" and "hard working"; (4) explicit and implicit approval of Conkwright's work manifested by his assignment to international programs shortly before his layoff; (5) the fact that MacLaughlin and Donald E. Tillman ("Tillman"), Conkwright's supervisors, did not recommend him for layoff and the fact that they were "stunned and surprised" when he was; (6) an absence of negative comments on his performance; and (7) the age bias and other flaws inherent in Westinghouse's performance appraisals. Opposition at 26–29. Construing these "facts" in a light most favorable to Conkwright, this Court fails to see any "genuine issue" of material fact as to the adequacy of Conkwright's performance at the time of his layoff.

The alleged "admission" by MacLaughlin that Conkwright was "meeting expectations", as well as the entire MCHR findings of facts are inadmissible evidence and, as such, shall not be considered by this Court in deciding this motion.[7] The favorable

---

pre-designed form which permits rating of various aspects of performance. Each factor is to be independently rated on an ascending scale from 1 to 4. Each overall "rating" indicated a "behavioral description". The rating of 2 meant the employee "produces acceptable results—*requires improvement." Id.* (emphasis supplied).

5. At or near the time of his December, 1984 evaluation, Conkwright completed a "Career Interest Form" in which he expressed concern that he was not being permitted to advance in the company. MacLaughlin met with Conkwright in late December, 1984, to address Conkwright's concern. Conkwright stated that he was not happy with his work and asked for more responsible work which would allow him to "make a better contribution". Specifically, he requested additional international work, including the Turkish and Japanese programs scheduled to commence in 1985. MacLaughlin informed Conkwright that although his performance was less than satisfactory and needed improvement, he would pursue his request. At the conclusion of the meeting, MacLaughlin told Conkwright that he would schedule a meeting for him with Dr. Pfeifer, Manager of Personnel Development. Conkwright met with Dr. Pfeifer on February 8, 1985, at which time he complained that he suffered from a "lack of motivation" which he admitted affected his performance. Conkwright found his current work to be "inherently dull and unchallenging". Pfeifer re-

sponded that Conkwright needed to improve his performance in his current position. Pfeifer, however, noted that MacLaughlin agreed to give Conkwright additional assignments within his abilities.

6. As of October 18, 1985, the three lowest rated performers were: (1) J.E. Meyers, a 2.4 performer in 1985 who was 30 years old; (2) Conkwright, a 2.5 performer in 1985 who was 60 years old; and (3) W.J. Jones, a 2.6 performer in 1985 who was 38 years old.

7. In weighing a motion for summary judgment, the court may consider any material that would be admissible or usable at trial. 10A C. Wright, A. Miller, M. Kane, *Federal Practice & Procedure* Civil 2d, § 2721 at 40 (1983 Supp.1990). Under Fourth Circuit law, the admission of findings of fact by the MCHR are discretionary with the trial court. *Goldberg,* 836 F.2d at 848 n. 4 ("While the admission of such findings is within the discretion of the district court ... such findings may be more prejudicial than probative"); *Cox v. Babcock and Wilcox Co.,* 471 F.2d 13, 15 (4th Cir.1972); *contra Plummer v. Western International Hotels Co., Inc.,* 656 F.2d 502, 504 (9th Cir.1981) ("We recognized that a civil rights plaintiff has the right to a de novo trial in federal court, and while prior administrative determinations are not binding, they are admis-

"co-worker" opinions upon which Conkwright relies are those of H.L. Swanson, Manfred Arnold and Stanley Propper and James Determan[8]. Opposition at 26. These persons were not Conkwright's supervisors at the time of his layoff, nor had they recently evaluated his performance. Determan was Conkwright's supervisor in 1981; thus his opinion, favorable or not, is irrelevant. The record reflects further that Conkwright worked with Swanson, Propper and Arnold an appreciably low percentage of time while serving in Contracts Management. Therefore, their opinions, whether helpful or otherwise, are simply irrelevant.

The fact that in 1985 Conkwright was assigned work in the international area does not create an issue of fact concerning his performance. His assignment to the international area does not imply, as Conkwright suggests, that Westinghouse believed his work had improved and that he merited additional duties. In fact, the evidence is to the contrary. Because of the loss of the DIVADS contract, MacLaughlin initiated a reorganization of contracts management. That reorganization resulted in Conkwright being assigned work on the international programs. This assignment was specifically requested by Conkwright in December, 1984, during his meeting with MacLaughlin and his follow-up discussion with Dr. Pfeifer. Thus, Westinghouse's subsequent assignment of Conkwright to international duties does not, as Conkwright suggests, indicate its approval of his performance. Viewed objectively, the reassignment was more a product of Westinghouse's efforts to accommodate a specific request of its employee rather than a reward for improved performance.

Next, Conkwright points to the fact that neither of his immediate supervisors, MacLaughlin or Tillman, recommended or approved his layoff.[9] This fact misses the point. Despite Conkwright's argument that the lack of his supervisor's approval somehow indicates that his work was meeting expectations, it was simply not MacLaughlin's nor Tillman's decision whom to layoff. That decision was made by Wilbert C. Cook, the manager of Contracts Management, based on the employee evaluation information supplied to him by his lower level managers. Conkwright cannot dispute that his performance evaluation were among the lowest of his peers. The fact that both MacLaughlin and Tillman or others were "stunned and surprised" by his layoff does not imply, that in the eyes of his employer, Conkwright was meeting expectations. Despite Conkwright's arguments that he was never subjected to negative comments on his performance from his immediate supervisor, the evidence demonstrates the contrary. As late as February, 1985, some nine months before his layoff, Dr. Pfeifer and MacLaughlin informed Conkwright that his performance was "less than satisfactory and that improvement was necessary". Motion of Defendant for Summary Judgment, Exhibit 17 (Paper Number 16). Finally, Conkwright argues that "it is perfectly clear on the record that the performance evaluations were inherent-

---

sible evidence."). This Court finds that the admission or consideration of the findings of the MCHR, in this case, would be more prejudicial than probative. Fed.R.Evid. 403.

Underlying this Court's decision to exclude consideration of the MCHR's findings is the fact that a particular conclusion contained within the report indicates that the entire report is untrustworthy. This Court previously discussed paragraph 20 of the written findings concluding that the MCHR investigator had no supportable basis on which to make the conclusion that Westinghouse had engaged in retaliatory activities. *See* Paper Number 13 at 4–5. The investigator, J. Neil Bell, apparently reached this conclusion based solely on Conkwright's opinion despite Bell's written conclusion that "[t]he

Commission staff has received significant testimony concerning ... the threat of retaliation toward anyone 'assisting' the Complainant in his charge against the Respondent". Opposition, Exhibit 1 (MCHR's Finding of Fact) (Paper Number 17). Bell testified at deposition that the persons allegedly identified by Conkwright as suffering from retaliation tactics denied that such acts took place. The disparity between Bell's conclusion on this point and the actual evidence in the record makes the entire report suspect.

8. Swanson, Propper and Arnold all worked in the area of international marketing.

9. MacLaughlin reported to Tillman.

ly age biased." Opposition at 28. This Courts finds no "perfectly clear" evidence suggesting the evaluations were made with an eye towards discriminating against older workers. To the contrary, the record reflects that Westinghouse made every effort, including multi-level managerial review, to ensure that each performance appraisal was fair and accurate.[10]

Conkwright fails to create any genuine issue of material fact concerning the substantial evidence offered by Westinghouse that he was in fact the among the lowest rated professional employees in Contract Management in the fall of 1985. Since this evidence is not disputed, this Court finds that, as a matter of law, Conkwright cannot demonstrate that he was meeting his employer's legitimate expectations at the time of his layoff. Therefore, Conkwright fails to produce sufficient evidence establishing a prima facie case under ADEA and, accordingly, Westinghouse is entitled to summary judgment.

### 2. Westinghouse's Nondiscriminatory Reasons

 Even assuming, *arguendo*, that Conkwright sufficiently demonstrates a prima facie case and thus creates a presumption of discrimination, Westinghouse has produced credible evidence demonstrating a valid nondiscriminatory reason underlying its decision to lay Conkwright off. As previously discussed, the RIF conducted at Westinghouse in the fall on 1985 was precipitated by the loss of the DIVADS contract. As a direct result of the loss of the contract, over two hundred employees were laid off to adjust to the reduced workload and loss of present and projected income. The evidence establishes that the selection and termination of those employees in the RIF were based strictly on performance evaluations completed previously. These reasons state a legitimate nondiscriminatory basis for Conkwright's layoff. Westinghouse is not required, at this juncture, to prove the absence of discriminatory motive, but "merely [to] articulate some legitimate reason for its action". *Fink,*

708 F.2d at 915; *Pfeifer,* 693 F.Supp. at 363. The presumption or inference of discrimination arising from proof of a prima facie case dissolves upon evidence of a legitimate nondiscriminatory reason. Since Westinghouse has produced sufficient evidence of a nondiscriminatory reason, the presumption is dissolved.

Conkwright, in his opposition, challenges Westinghouse's stated nondiscriminatory reasons, arguing that it is a matter of "credibility" to be determined by the jury. Specifically, Conkwright submits that the following evidence creates an issue of fact concerning Westinghouse's stated nondiscriminatory reason: (1) the MCHR findings; (2) Conkwright's assignment to international work prior to his layoff; (3) the favorable evaluations of Swanson, Arnold and Propper; (4) Westinghouse's failure to maintain records of favorable comments on Conkwright's performance; and (5) the selection process resulting in a disproportionate number of older workers being nominated for layoff. The first three items identified by Conkwright were previously discussed by this Court as not creating an issue of material fact. Westinghouse's alleged failure to maintain information refers to a letter by Determan allegedly reflecting his favorable comments on Conkwright's work performance. Whether this letter was retained by Westinghouse or not, the fact remains that Determan's opinion concerning Conkwright's performance was not relevant to management's decision to terminate Conkwright from Contract Management. Finally, Conkwright argues that the evidence indicates that Westinghouse's original list nominating persons for layoff disproportionately included a higher number of older employees. Although this may be true, there is no credible evidence to suggest that the fact was a product of discriminatory intent. Indeed, the evidence suggests the contrary. The list was generated from neutral performance evaluations submitted to management by lower level managers. Thereafter, Westinghouse voluntarily elected to form an executive

---

**10.** The Court notes that of the three workers selected for layoff within the MacLaughlin group, two were under forty years old and both were given low ratings.

management committee to review, for the purpose of determining fairness, all those names included on the list.[11] Employees were removed from the list that were close to becoming vested in Westinghouse's employee pension system. Further, members of the committee questioned individual managers concerning particular employees included on the list. Conkwright's inclusion on the list was questioned and reviewed by Joe Ryan. Upon confirmation from MacLaughlin that Conkwright was among the lowest performing employees in the group, Ryan allowed his name to remain on the list. Westinghouse's efforts to create a nomination list for the impending RIF demonstrate that it enlisted every effort to act age neutrally in its termination decisions. Conkwright fails to demonstrate any genuine issue of material fact on this point.

### 3. Conkwright's Evidence of Pretext

■ Further assuming that Conkwright has proved a prima facie case, this Court, as discussed above, finds that Westinghouse has articulated a legitimate non-discriminatory reason and, further, that Conkwright fails to discredit that reason as a pretext for the alleged discriminatory action of Westinghouse. Under the burden of proof scheme set forth above, Conkwright bears the burden of rebutting Westinghouse's stated reason for his layoff and demonstrating that the use of his performance evaluations was a mere pretext disguising that Conkwright's age was the likely reason underlying his discharge. *Herold*, 864 F.2d at 319. Thus, the issue at this stage is whether age, rather than the performance ratings, were used by Westinghouse as the factor in selecting Conkwright for layoff. The evidence demonstrates that age was not the factor and the use of the performance evaluations was not a pretext.

This Court has previously recognized that in employment discrimination cases involving a reduction in force, it is not the court's duty to second guess the business judgment of defendant's employees or managers. Judge J. Fredrick Motz in *Bossalina v. Lever Bros. Co.*, 47 Fair Empl. Prac. Cas. 1264 (BNA), 1986 WL 9814 (D.Md.1986), *aff'd*, 849 F.2d 604 (4th Cir. 1988) stated:

> [T]he issue is not whether the employer was correct in its determination that the plaintiff's performance was unsatisfactory but only whether the evaluation of performance was the reason for termination ... While the plaintiffs contest the evaluation of their performance by Lever Brothers, the facts upon which this judgment was based ... undeniabl[y] exist. It is not within the province of plaintiffs or of the Court to review the soundness of Lever Brothers' business judgment either in the evaluation of particular employees or in deciding to engage in a reduction of supervisory force.

*Id.* at 1267; *citing Western Electric Co.*, 713 F.2d at 1016; *Williams v. General Motors*, 656 F.2d 120 (5th Cir.1981), *cert. denied*, 455 U.S. 943, 102 S.Ct. 1439, 71 L.Ed.2d 655 (1982); *see also Pfeifer*, 693 F.Supp. at 365 (Recognizing that "what matters is 'the perception of the decisionmaker' "). On this record, it is well established that the Conkwright's termination was a "business decision". The loss of the DIVADS contract forced Westinghouse to make hard choices on the personnel it had to eliminate. Management chose to select those ultimately destined for layoff on the neutral basis of employee ratings. Furthermore, it is clear that management re-

---

**11.** The members of the committee were Earl S. King ("King"), Manager Human Resources Services and Programs, Robert C. Riede ("Riede"), Manager Compensation, Joseph C. Ryan ("Ryan"), Executive Assistant to the President, and Marvin E. Jones ("Jones"), Director of Human Resources. H.B. Smith, the President of the Defense Business Unit, which includes D & EC, promulgated directives to be implemented by the committee which included removing from the nomination list all persons nearing certain retirement entitlement milestones under Westinghouse's pension plan. Smith directed that the committee also review all persons nominated to ensure "fairness". If any member of the committee questioned the presence of any employee, he was to contact the manger who nominated that individual to ensure that the selection was fair and nondiscriminatory.

lied on the performance appraisals in nominating employees for termination. It is simply not this Court's duty to "second guess" Westinghouse's method of implementing the RIF nor its performance ratings of employees. Viewed objectively, the evidence indicates that the use of the ratings was fair and nothing to the contrary indicates that age was a factor in any termination decision.

To summarize, an analysis of the *McDonnell Douglas* burden of proof allocation in this case reveals the lack of any evidence supporting Conkwright's ADEA claim. No prima facie case has been shown by Conkwright. Even assuming that enough evidence is present allowing a presumption of discrimination, Westinghouse successfully rebuts the presumption by articulating a legitimate reason for discharge. Conkwright fails to raise a genuine issue of fact as to whether the Westinghouse's articulated reason is credible. Finally, Conkwright fails to demonstrate any evidence which may establish pretext. This Court concludes that no reasonable jury could find from Conkwright's evidence viewed in the light most favorable to him that he was discriminated against on the basis on his age. For these reasons, summary judgment on the Count I shall be granted in Westinghouse's favor.

## C. *Count II—ERISA*

■ Conkwright seeks damages under § 510 of ERISA alleging that Westinghouse intentionally sought to deprive him of further participation in Westinghouse's pension plan and to avoid any possible adverse economic impact that such continued participation would cause.[12] Section 510 provides, in pertinent part:

Interference with protected rights.

It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan,

... or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan ...

29 U.S.C. § 1140 (1982 Supp.1990). Conkwright's claim raises the issue of whether a fully vested employee may state an action under § 510 by alleging that his employer acted to prevent accrual of additional benefits under the vested plan. Some courts hold that such a claim is viable under § 510. *See e.g. Clark v. Resistoflex Co.*, 854 F.2d 762, 770–71 (5th Cir.1988) (discussing the issue); *Kross v. Western Electric Co.*, 701 F.2d 1238, 1243 (7th Cir.1983) ("[W]e conclude that [plaintiff], by alleging that he was discharged for the purpose of depriving him of continued participation in [defendant's] ... plans, has stated a claim cognizable under § 510 of ERISA); *Nemeth v. Clark Equipment Co.*, 677 F.Supp. 899, 907–09 (W.D.Mich.1987) ("ERISA protects against employer action taken to prevent the accrual of additional rights or benefits under a qualified plan); *Garry v. TRW, Inc.*, 603 F.Supp. 157, 162 (N.D.Ohio 1985) ("[T]his Court concludes that § 510 does not preclude an employee from pursuing ... a claim simply because his benefits have vested"). While other courts have concluded that fully vested employees are barred from pursuing a § 510 claim. *See e.g. Kelly v. Chase Manhattan Bank*, 717 F.Supp. 227, 232 (S.D.N.Y.1989) ("The defendant concedes that the plaintiff was fully vested in his pension plan at the time of his discharge. Thus, the plaintiff's claim is that had he remained as an employee, he would have accrued additional benefits. Such a claim is not cognizable under section 510") *citing Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1111 (2nd Cir. 1988) and *Baker v. Kaiser Aluminum & Chem. Corp.*, 608 F.Supp. 1315, 1319 (N.D. Cal.1984); *Corum v. Farm Credit Services*, 628 F.Supp. 707, 717 (D.Minn.1986) ("Since plaintiff's pension rights were vested, he cannot maintain that defendant fired him in order to prevent plaintiff from obtaining vested pension rights"); *Moehle v.*

---

**12.** At the time of his election to retire, Conkwright was 100% vested in Westinghouse's pension plan.

*N.L. Industries, Inc.*, 646 F.Supp. 769, 779 n. 6 (E.D.Mo.1986), *aff'd*, 845 F.2d 1027 (8th Cir.1988) ("Plaintiffs ... have not alleged facts which would state a claim for relief under § 1140 [§ 510] ... plaintiffs were vested and § 1140 is designed to prevent employers from discharging employees in order to prevent vesting"); *Donohue v. Custom Management Corp.*, 634 F.Supp. 1190, 1197 (W.D.Pa.1986) ("claims [of plaintiffs fully vested in retirement income plan] are not within the legislative purpose of section 510 of ERISA"). The Fourth Circuit has yet to consider the issue.

The Seventh Circuit in *Kross*, reviewing § 510's legislative history, stated:

> There is no evidence that Congress intended ERISA to afford less protection to senior employees than that enjoyed by probationary or junior employee who have not qualified for coverage under particular employee benefit plans. Certainly, Congress did not enact ERISA with the intent to negate the long established practice of affording greater benefits and protections to those employees who have more seniority in time of service with the company than to junior employees. Accordingly, we reject the district court's unsupported and narrow interpretation of § 510.

*Kross*, 701 F.2d at 1243 (reversing the district court's grant of summary judgment for the defendant). Despite the split of authority concerning the issue, this Court finds that the legislative history of § 510 does not prohibit a vested employee from stating a cause of action for alleged interference in accrual of future benefits.

Some courts construing actions under § 510, hold that to succeed, a plaintiff must demonstrate proof of a *specific intent* by the defendant to interfere with the attainment of his pension rights. *See e.g Dister*, 859 F.2d at 1111; *Gavalik v. Continental Can Co.*, 812 F.2d 834, 851 (3rd Cir.), *cert. denied*, 484 U.S. 979, 108 S.Ct. 495, 98 L.Ed.2d 492 (1987); *Vogel v. Independence Federal Sav. Bank*, 728 F.Supp. 1210, 1225–26 (D.Md.1990); *McLendon v. Continental Group, Inc.*, 660 F.Supp. 1553, 1557 (D.N.J.1987); *Johnson v. United Airlines,*

*Inc.*, 680 F.Supp. 1425, 1432 (D.Hawaii 1987); *Titsch v. Reliance Group, Inc.*, 548 F.Supp. 983, 985 (S.D.N.Y.1982), *aff'd mem.*, 742 F.2d 1441 (2nd Cir.1983). Other courts have concluded that proof of specific intent is not required. *See e.g. Furcini v. Equibank, NA*, 660 F.Supp. 1436, 1442 (W.D.Pa.1987). Although the Fourth Circuit has yet to consider this issue, *see Vogel*, 728 F.Supp. at 1226, this Court finds that the reasoning expressed in *Dister* and *Gavalik* is applicable to Conkwright's claims under § 510.

■ The Second Circuit in *Dister* held that the *McDonnell Douglas* scheme of proof, applicable to Title VII and ADEA cases, is "equally appropriate in the context of discriminatory discharge cases brought under § 510 of ERISA". *Dister*, 859 F.2d at 1112; *see also Gavalik*, 812 F.2d at 852. Therefore, it is incumbent upon Conkwright to demonstrate that his termination was a "pretext" to escape incurring the additional financial demands of his pension. For the reasons stated in Section II(B) of this opinion, this Court finds that Westinghouse's decision to terminate Conkwright was a legitimate business decision.

Nevertheless, Conkwright points to testimony of Westinghouse officials that its decision to implement the RIF was based on "financial need". Thus, Conkwright infers that Westinghouse's need to save money motivated it to terminate him in an effort to block any further accrual of pension benefits. This reasoning is skewed. The facts establish that Conkwright, at the time of his termination, was vested in Westinghouse's pension plan. No evidence suggests that Westinghouse intended not to honor its commitment to the plan. Indeed, the evidence establishes that Westinghouse specifically removed from the nomination list employees who were near vesting. This was among the purposes for the management review committee. Westinghouse laid off Conkwright in an effort to reduce costs and nothing suggests that any consideration was given to additional pension expenses that would be incurred if

Conkwright were to remain with the company.[13] Thus, Conkwright fails to establish a genuine issue of fact as to a critical element of his § 510 claim and, accordingly, Westinghouse is entitled to summary judgment on Count II.

### D. Count III—Breach of Employment Contract

■ Count III presents a pendent state law claim for breach of employment contract. Conkwright claims that his termination violated the "pledges and representations in defendant's Employee Handbook relating to fair treatment and stability of employment, as well as equal employment opportunity to qualified individuals regardless of age." Complaint, Paragraphs 6, 16, and 17 (Paper Number 1). Although Conkwright did not enter into a formal employee contract, he claims that statements in various handbooks created contractual rights.

In Maryland, an employment relationship for an indefinite term is considered "at will" employment, terminable by either party at any time. Adler v. American Standard Corp., 291 Md. 31, 432 A.2d 464 (1981). Among the limited exceptions to this doctrine Adler recognized are employment practices which violate public policy. Another exception was recognized by the Maryland Court of Appeals in Dahl v. Brunswick Corp., 277 Md. 471, 356 A.2d 221 (1976). The Dahl court said:·

> [T]here is abundant support for the proposition that employer policy directives regarding aspects of the employment relation become contractual obligations when, with knowledge of their existence, employees start or continue to work for the employer.

Dahl, 277 Md. at 476, 356 A.2d at 224.[14] Although the validity of implied employment contracts has been recognized, Maryland courts have refused to find employment contracts where the publications contained only general policy statements, MacGill v. Blue Cross of Maryland, Inc., 77 Md.App. 613, 551 A.2d 501, cert. denied, 315 Md. 692, 556 A.2d 673 (1989), or where an express disclaimer was included. Fournier v. United States Fidelity & Guaranty Co., 82 Md.App. 31, 569 A.2d 1299 (1990); Castiglione v. Johns Hopkins Hospital, 69 Md.App. 325, 517 A.2d 786 (1986), cert. denied, 309 Md. 325, 523 A.2d 1013 (1987).

The policy manual in Fournier and Castiglione contained express disclaimer language that negated any inference that the policy could be viewed as a contract.[15] The employee handbook Conkwright relies upon contained a disclaimer in bold print:

> The contents are not to be construed as a contract of employment. Many of the subjects discussed are condensed from specific policies and procedures. If you have any questions about a particular subject, please ask your supervisor.

Motion of Defendant for Summary Judgment at 45 (Paper Number 16). This language clearly and unambiguously indicates that the statements are not meant to create contractual rights. Thus, under Fournier and Castiglione, the handbook specifically disclaims any implied contract. Further, although the handbook originally provided to Conkwright allegedly lacked an express disclaimer, Conkwright's continued employment with Westinghouse following the subsequent inclusion of the disclaimer in the handbook renders the disclaimer binding.

---

**13.** At least one court has found that a corporation's decision to reduce costs alone is insufficient to establish a violation of § 510. Nemeth, 677 F.Supp. at 906.

**14.** In Dahl, the defendant agreed that its policy on severance pay constituted a unilateral contract. The issue before the court was whether the plaintiffs there were entitled to severance pay.

**15.** The manual at issue in Castiglione included the following language:

> Finally, this handbook does not constitute an express or implied contract. The employee may separate from his/her employment at any time; the Hospital reserves the right to do the same.

Castiglione, 69 Md.App. at 329, 517 A.2d at 788. Moreover, the hospital reserved its right "to direct and discipline our workforce ... and to take whatever action is necessary in our judgment to operate [the Defendant Hospital]." Id. at 330, 517 A.2d at 793.

*Castiglione,* 69 Md.App. at 335, 517 A.2d at 791 n. 4.

Finally, even assuming that no disclaimer is present, the language referenced by Conkwright is not definite enough to create a contractual right. The provisions cited are merely general statements. *Staggs v. Blue Cross of Maryland, Inc.,* 61 Md.App. 381, 392, 486 A.2d 798, 803–804, *cert. denied,* 303 Md. 295, 493 A.2d 349 (1985) ("general statements of policy are no more than that and do not meet the contractual requirement for an offer"). It is undisputed that throughout his entire tenure at Westinghouse, Conkwright remained an at will employee subject to termination. Thus, since no material fact is in dispute, the motion for summary judgment as to Count III shall be granted.

### E. *Count IV—Abusive Discharge*

 Conkwright asserts that his forced layoff amounts to an abusive discharge in violation of Maryland public policy. *Adler,* 291 Md. 31, 432 A.2d 464. Both the Fourth Circuit Court of Appeals and the Court of Appeals of Maryland hold that the tort of abusive discharge is not viable where a discharge is motivated by employment discrimination which is prohibited by federal or state employment discrimination laws. *See Makovi v. Sherwin–Williams Co.,* 316 Md. 603, 561 A.2d 179 (1989); *Parlato v. Abbott Laboratories,* 850 F.2d 203, 206 (4th Cir.1988), *aff'd,* 886 F.2d 1429 (1989); *Glezos v. Amalfi Ristorante Italiano, Inc.,* 651 F.Supp. 1271, 1275–76 (D.Md. 1987). The violation of public policy that Conkwright seeks to remedy through his abusive discharge claim is clearly protected both by federal and state law. Conkwright concedes this in his opposition. Opposition at 47 (Paper Number 17). Therefore, since no material fact remains in dispute, this Court shall grant Westinghouse's motion with respect to Count IV of the complaint.

### III. CONCLUSION

For the reasons stated, Westinghouse's motion for summary judgment shall be granted. A separate order shall be entered.